**Mark LEVIN and Becky Levin, Plaintiff,**

v.

**Roger J. HARNED, d/b/a Roger Harned Designs, Dalva Brothers, Inc., Foster-Gwin, Inc., John J. Nelson Antiques, Ed Hardy Antiques, a/k/a Ed Hardy San Francisco, and Newel Art Galleries, Inc., Defendants.**

**No. CIV.A.01–11354–PBS.**

United States District Court, D. Massachusetts.

July 24, 2003.

Order on Report and Recommendation, July 25, 2003.

Memorandum and Order on Report and Recommendation, Sept. 17, 2003.

Anthony A. Scibelli, Brian E. Whiteley, Scibelli & Whiteley, LLP, Richard J. Innis, Hale & Dorr, LLP, Boston, MA, for Plaintiff.

Christopher P. Litterio, Ruberto, Israel & Weiner, P.C., Boston, MA, Mark R. Kook, Hartman & Craven LLP, New York, NY, for Defendant.

## ORDER

SARIS, District Judge.

■ After hearing and a review of the supplemental submissions, the Court adopts the Report and Recommendation with respect to Newel Art Galleries, Inc. ("Newel"), and concludes that it lacks specific and general personal jurisdiction over Newel. While Newel knew that the shipping company was based in Massachusetts, there is no evidence that Newel knew the end-users of the antiques were residents of Massachusetts. Indeed, the undisputed evidence is that Newel believed the destination was Rhode Island. Finally, plaintiffs have presented no evidence of in-forum contacts relating to the sale of the antiques. In the interest of justice, the Court orders the action against Newel transferred to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1406(a). Counsel shall work with the clerk to ensure that the appropriate papers are transferred.

## ORDER ON REPORT AND RECOMMENDATION

■ After hearing and a review of the supplemental submissions, the Court adopts the Report and Recommendation with respect to John J. Nelson Antiques ("Nelson"), and concludes that it lacks specific and general personal jurisdiction over Nelson. (Docket No. 20).

Plaintiffs point to one in-forum contact with Roger J. Harned, the plaintiffs' interior designer, relating to the sale of the antiques. Specifically, Nelson sent photographs to Harned while he was staying with friends at a Boston hotel so that he could make a presentation to his clients the next day. That one fortuitous forum contact is insufficient to support the exer-

cise of personal jurisdiction. "The weight of authority among the courts of appeal is that minimal communication between the defendant and the plaintiff in the forum state, without more, will not subject the defendant to the jurisdiction of that state's court system." *Imo Industries, Inc. v. Kiekert AG*, 155 F.3d 254, 260 (3d Cir. 1998).

Plaintiffs have not presented a prima facie case that Nelson targeted a Massachusetts resident. Nelson had been told that the Harneds resided on the East Coast, but there is no evidence that Nelson ever shipped goods to Massachusetts or knew the end-users of the antiques were residents of Massachusetts. While the fact that Harned was spending the night at the Ritz for a presentation to his clients was a clue they might live in Massachusetts, that hint is insufficient to suggest that Nelson could reasonably have anticipated being haled into court here.

In the interest of justice, the Court orders the action against Nelson transferred to the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1406(a). Counsel shall work with the clerk to ensure that the appropriate papers are transferred.

## MEMORANDUM AND ORDER ON REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiffs, Mark and Becky Levin ("the Levins") assert fraud, breach of contract, negligence, unfair and deceptive trade practices, and other common law claims against six defendants: Roger J. Harned, d/b/a Roger Harned Designs ("Harned"); Dalva Brothers, Inc. ("Dalva"); Foster–Gwin, Inc. ("Foster"); John J. Nelson Antiques ("Nelson"); Ed Hardy Antiques, a/k/a Ed Hardy San Francisco ("Hardy"); and Newel Art Galleries ("Newel").

The Levins hired Harned as an interior designer for their homes in Boston, Massachusetts and Middletown, Rhode Island. The five other defendants are all antique dealers that sold antiques to decorate the Levin homes. Plaintiffs claim that they relied on the deceptive descriptions of the items provided to Harned by the antiques dealers, in spending nearly five million dollars. Each of the five antiques dealers filed separate motions to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2).

On September 11, 2002, Magistrate Judge Cohen issued a Report and Recommendation on Motions to Dismiss for Want of In Personam Jurisdiction ("Report and Recommendation"). Judge Cohen recommended that the Court allow the motions to dismiss for lack of personal jurisdiction filed by the five antiques dealers: Dalva, Hardy, Foster, Nelson, and Newel. The Court assumes familiarity with that opinion. The Court adopts fully the analysis of the magistrate judge concerning general jurisdiction, and will not repeat it here.

After a hearing, supplemental jurisdictional discovery, and review of the voluminous briefing, the Court adopts the Report and Recommendation with respect to Nelson and Newel, both of which had little or no knowledge that the purchasers of the antiques resided in Massachusetts, or that they would receive the allegedly fraudulent descriptions of the antiques in Massachusetts. Thus, they did not purposely avail themselves of the forum. However, the Court declines to adopt the Report and Recommendation with respect to Dalva, Foster, and Hardy, and **DENIES** the motion to dismiss.

### II. FACTUAL BACKGROUND

The following facts are gleaned from the allegations in the Amended Complaint construed "in the light most congenial to the

plaintiff's jurisdictional claim." *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir.1998). The Court also considers the undisputed facts established during jurisdictional discovery. *Id.*

### 1. *Antique Lovers.*

The Levins live in Boston and own a vacation home in Middletown, Rhode Island. They sought to furnish both homes with authentic and valuable antiques. The Levins hired Harned, an interior designer, to recommend and purchase antiques for both homes. On October 23 and 24, 2000, Harned met with the Levins in Boston to discuss his recommendations as to furnishings. He presented the Levins with photographs and descriptions of various antique items he recommended that they purchase, which he had received from the defendant antique dealers. On October 31, 2000, the Levins wired $4.9 million to Harned to buy antiques.

### 2. *Dalva Brothers.*

Dalva Brothers is an antique dealer that specializes in fine 18th-century French furniture and art. It is a New York corporation with a principal place of business in New York City. When Harned met with the Levins in Boston in October 2000, he presented them with photographs and descriptions of several items from Dalva Brothers, including what was described as an "exceptionally rare" Regence grandfather's clock made in France during the 18th century with a purchase price of $550,000. None of the written or oral descriptions indicated that it had undergone a restoration of any kind. Allegedly, the clock is neither authentic nor valuable. Although the case may have originated in the 18th century, the clock was drastically restored in the mid–19th century and the fair market value of the clock is in the range of only a few thousand dollars.

Similarly, Harned showed the Levins photographs and descriptions of two commodes, worth $110,000 and $90,000, which failed to show that the items had undergone significant restorations. Allegedly, the commodes had been so recently and extensively restored that their value has been substantially decreased.

Relying on the misrepresentations conveyed during their meeting in Boston, the Levins told Harned in Boston to purchase all three items. On November 6, 2000, Dalva Brothers provided three invoices to Harned acting on behalf of the Levins for the antiques. The items were picked up in New York by a Massachusetts-based trucking company and delivered to a Massachusetts warehouse in Avon, Massachusetts, before being sent to Middletown.

The Levins also purchased items from Dalva Brothers for their home in Boston. In February 1999, the Levins purchased a pair of vases, a marble table, and a majolica inkwell, totaling more than $100,000 with commissions, for the Levins' Boston home.

Dalva sold items to the Levins in 1997, 1999 and 2000, and received more than $765,000 from the 1999 and 2000 transactions. Dalva's files from as early as 1997 contain documents indicating that Dalva knew the Levins lived in Massachusetts, was aware that the Levins were the purchasers of the items sold, and that all of the items were shipped to Massachusetts. The 1997 delivery receipt states "Mr. & Mrs. Levin, Boylston Street, Boston, MA." Further, the 1999 and 2000 delivery documents received from a shipping company in Avon, Massachusetts, also name the Levins. Lastly, a check to Dalva in 2000 for payment of goods, names the Levins in the description heading of the document.

Dalva dealt in New York with Harned, an agent of the Levins, and not directly

with the Levins. Harned, not Dalva, made the shipping arrangements with the Massachusetts shipper to the Commonwealth. Although Dalva gave Harned pictures and descriptions that it knew he would give to the Levins in Massachusetts, it never communicated directly with the Levins. The defendant made no direct in-forum contacts (via fax, telephone or mail) related to the allegedly fraudulent sale of antiques.

Dalva is not "authorized" to do business in Massachusetts, has no employees or agents in Massachusetts, owns no real or personal property in the Commonwealth, does not advertise in any publications directed to residents of Massachusetts, and does not solicit business in Massachusetts.

### 3. Foster–Gwin.

Foster–Gwin is a California corporation, specializing in period furniture from Europe, with a principal place of business in San Francisco, California.

In February 1999, the Levins purchased several items from Foster–Gwin for their home in Boston totaling $600,000. The items included commodes, a secretary, and a mirror. With one exception, none of the written or oral descriptions indicated that these items had undergone a restoration of any kind. The items, which were purchased for the Levins by Harned, were shipped from California to Boston.

When Harned met with the Levins in Boston in October 2000, he presented them with photographs and descriptions of several items: an "extremely rare pair of Italian baroque period red painted credenza" for $365,000; an "Unusual Italian Empire Period Cream Painted Chaise lounge" for $44,000; and a "South German Baroque period blue-painted Commode" for $37,000. None of the written or oral descriptions from Foster–Gwin indicated that they were of recent manufacture or had undergone a restoration of any kind (ex-

cept with respect to the feet of the blue commode). In reliance on these representations, the Levins purchased the goods from their home in Boston. Some of the items were delivered to Massachusetts prior to being delivered to Middletown.

Allegedly, the red painted credenzas are nothing more than assemblages of old wood from other sources and the fair market value is within a range of $4,000 to $8,000; the cream chaise is actually not from the early 19th century, as represented, but a modern 20th century piece of furniture with a value of less than $1,000; and the blue-painted commode is not from the Baroque period but is a recycled artifact of the late 20th century with a range of $750 to $1,250. The Levins also claim that several of the items purchased for the Levins' home in Boston are not authentic or valuable, such as the alleged 18th century Sicilian commode.

Foster–Gwin sold antiques to the Levins in 1997, 1999, and 2000. Although Harned paid for the items with his own checks, Harned told Foster–Gwin that he was acting on behalf of Mark and Becky Levin. Foster–Gwin dealt only with Harned who arranged for the shipping of the furniture to Boston. As of February 1999, S. Collier Gwin, the President, knew that the items were being shipped to Harned's clients in Boston, and by October–November 2000, he knew that Harned's clients were named the Levins. Foster–Gwin understood that the clients were working on a house in Rhode Island, and that some of the items would be held in Boston for the house being worked on in Rhode Island. The 1999 and 2000 items, worth about $560,000, were purchased from Foster–Gwin and were shipped from California to Boston. The invoices for all items are addressed to Roger Harned in California, but many invoices have the notation "shipment to Boston; will hold until advised." When all

reasonable inferences are drawn in favor of plaintiff's jurisdictional assertions, Foster–Gwin was aware it was sending the description of the antiques and the antiques themselves to Boston.

Foster–Gwin owns no property in Massachusetts, has no employees in the Commonwealth, and does not advertise in publications directed towards Massachusetts. However, it has placed advertisements in national magazines circulated in Massachusetts. It has no web site of its own, although it advertises on other websites, and has shipped no furniture to Massachusetts residents. It has made only two small sales to Massachusetts residents in recent years, but it purchased items from an auctioneer in Cambridge in January 2000.

### 4. *Ed Hardy Antiques.*

Hardy is a California corporation, specializing in antique furnishings, with a principal place of business in San Francisco, California.

In February 1999 the Levins purchased more than $275,000 of items from Hardy for their Boston home. Hardy sold antiques to Harned, who informed the head of sales, Kendra Boutell, that he was purchasing items for the Levins in Boston.

In October 2000, the Levins, from their home in Boston, purchased several items from Hardy for their Middletown, Rhode Island home based on photographs and descriptions presented by Harned. The descriptions included: a "Pair of French Louis XV walnut bergeres ... mid–18th Century" for $34,826 and an "Italian Neoclassical ... Painted Two–Door Armoire ... circa 1780" for $43,500. The descriptions disclosed that there had been "restorations" to the pieces, but the age and value of the pieces were nonetheless misrepresented. For example, the French Louis XV walnut bergeres are late 20th century reproductions, with a fair market value of less than $2,000 and the Italian Neo-classical Painted Two–Door Armoire is made from old wood or recently refurbished, with a late 20th century paint scheme and is worth between $2,000 to $3,000. Harned again informed the head of sales at Hardy that he was purchasing antiques for the Levins, this time for their home in Rhode Island. It invoiced Harned at his California address, and delivered the items to a third-party shipper in California.

Hardy has no employees, office, bank account, or property in Massachusetts and does not advertise in publications specifically directed at Massachusetts. Hardy mailed catalogs to a designer in Massachusetts but has not engaged in any business with this designer in the last five years. It maintains a web-site and advertises in the San Francisco Antique Show catalog distributed nationally.

## III. DISCUSSION

### 1. *Long Arm Jurisdiction Under State Law*

The Levins assert specific personal jurisdiction over the defendants under the Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, § 3 (2000). Specifically, the plaintiffs rely on § 3(a) ("transacting any business in this commonwealth"), § 3(b) (contracting to supply things in the Commonwealth), and § 3(d) ("causing tortious injury by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed ... in this commonwealth").

■ Section § 3(a) has been construed broadly: "transacting any business" means any purposeful act directed to the forum

state. *See Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 982 (1st Cir.1986). Thus, the jurisdictional inquiry is largely a federal constitutional one because the Massachusetts courts construe section 3(a)'s "transacting business" requisite as extending jurisdiction to the horizons of the Due Process Clause of the Fourteenth Amendment. *See Daynard v. Ness,* 290 F.3d 42, 52 (1st Cir.2002); *Tatro v. Manor Care, Inc.,* 416 Mass. 763, 767, 625 N.E.2d 549, 553–53 (1994) ("Although an isolated and minor transaction with a Massachusetts resident may be insufficient, generally the purposeful and successful solicitation of business from residents of the Commonwealth by a defendant or its agent, will suffice to satisfy this requirement."); *Automatic Sprinkler Corp. of Am. v. Seneca Foods Corp.,* 361 Mass. 441, 443, 280 N.E.2d 423, 424 (1972) ("We see the function of the long arm statute as an assertion over the person to the limits allowed by the Constitution of the United States.").

2. *Due Process.*

 Plaintiffs must demonstrate that the exercise of jurisdiction comports with the Due Process Clause of the Constitution. *See Mass. Sch. of Law,* 142 F.3d at 35 (1st Cir.1998). When the in-forum contacts fall short of being "continuous and systematic" so that the exercise of general jurisdiction would be unfair, those contacts may still support the exercise of specific jurisdiction if they are related to the cause of action. *See United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 623 (1st Cir. 2001) (involving claim against a foreign banking concern for breach of contract, unjust enrichment and conversion). Specific personal jurisdiction can be asserted over a defendant only if: (1) the claim "directly relates to or arises from the defendant's contacts with the forum"; and (2) "the contacts constitute purposeful availment of the benefits and protections

afforded by the forum's laws." *Id.* at 620–21. If these two requirements are met, then (3) the court must look at the "overall reasonableness of the exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." *Id.* at 621.

 Reasonableness is determined by the so-called gestalt factors: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *See United Elec. Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1088 (1st Cir.1992). The reasonableness stage of the jurisdictional analysis evokes a sliding scale: "[T]he weaker the plaintiff's showings on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness." *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 210 (1st Cir.1994). Moreover, a failure to demonstrate the necessary minimum contacts eliminates the need even to reach the issue of reasonableness: "[t]he Gestalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled." *163 Pleasant St.,* 960 F.2d at 1091 n. 11.

3. *Arises out of/ Relatedness.*

In determining whether a claim directly relates to or arises out of the defendant's

contacts with the forum, the Court must identify the contacts. Plaintiffs identify the transmission of the written descriptions and pictures of the antiques into the forum and the shipping of the goods to residents of the forum. Defendants point to the fact that plaintiffs do not allege any related contacts with the forum like telephone calls, mail or physical presence. They also emphasize that the interior designer arranged the shipping.

■ The relatedness inquiry differs depending on the cause of action. The opinion of the United States Magistrate Judge focused primarily on the sufficiency of contacts for a breach of contract claim. *See Swiss Bank*, 274 F.3d at 621 (cautioning that a "contract" by itself cannot automatically establish minimum contacts). However, the issue is more complicated because the primary claim here is fraud, an intentional tort, that was directed at the forum. *See Mass. Sch. of Law*, 142 F.3d at 35 (explaining that if the cause of action is a tort claim, the court will customarily focus on causation: whether the plaintiff has established "cause in fact" (i.e., the injury would not have occurred "but for" the defendants' forum-state activity) and "legal cause" (i.e., the defendant's in-state conduct gave birth to the cause of action)). Indeed, the analysis of the adequacy of the contacts for "relatedness" purposes also turns on the nature of the tort, as will be seen below.

A. *Calder*

The difficult issue is whether in the context of an intentional tort like fraud, the in-forum effects of extra-forum activities are sufficient to constitute minimum contacts. In *Calder v. Jones*, 465 U.S. 783, 789, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), the Supreme Court held that California could assert personal jurisdiction over newspapermen in a defamation action

based on the "effects" in California of defendants' tortious Florida conduct "because intentional conduct in Florida was calculated to cause injury to respondent in California." *Id.* at 789–90, 104 S.Ct. 1482. It reasoned:

> [The] petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at [the forum] … And they knew that the brunt of that injury would be felt by respondent in the [forum] … An individual injured in [the forum] need not go to the [non-resident's state] to seek redress from persons who, though remaining in [their state], knowingly cause the injury in [the forum].

The "effects" test was drawn from Section 37 of the *Restatement (Second) of Conflicts of Laws*, which provides:

> A state has power to exercise personal jurisdiction over an individual who causes effects in the state by an act done elsewhere with respect to any cause of action arising from these effects unless the nature of the effects and the individual's relationship to the state make the exercise of jurisdiction unreasonable.

Comment e states: "When the act was done with the intention of causing the particular effects in the state, the state is likely to have personal jurisdiction though the defendant had no other contact with the state. This will almost surely be so when the effect involves injury to person or damage to tangible property." *Id.* at 54, 57 (1988 revision).

The First Circuit has narrowly construed *Calder*, holding that "the 'effects' test is a gauge for purposeful availment and is to be applied only *after* the relatedness prong has already been satisfied." *Swiss Bank*, 274 F.3d at 623 (emphasis added). As a general matter, it has held that the in-forum effects of extra-forum

activities "without more" fail to sustain an action in the forum court. *Id.* at 625, citing *Mass. Sch. of Law,* 142 F.3d at 36. The First Circuit distinguished *Calder* because the "actual tort or injury, not just its consequences, occurred within the forum." *Swiss Bank,* 274 F.3d at 624–25.

In a thoughtful dissent in *Swiss Bank,* Judge Lipez construed the Restatement "effects" test approved in *Calder* to include a relatedness element: "It permits a state to exercise effects-based jurisdiction only when the plaintiff's claims arise out of or relate to the in-forum effects of the defendant's acts." 274 F.3d at 630. Relying on *Restatement (Second) of Conflict of Laws,* § 37 cmt. e, Judge Lipez states, "Under *Calder,* in order for jurisdiction to be based *solely* on the in-forum effects of the defendant's activity, the plaintiff must show that the defendant acted 'for the very purpose' of causing harmful effects in the forum." *Id.* at 632.

 Numerous courts have upheld a court's exercise of personal jurisdiction over non-resident defendants with no direct contact with the forum when the intentional tort was individually targeted at the resident of the forum state, and the brunt of the harm was felt there. In *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.,* 207 F.3d 1351, 1358 (11th Cir.2000), for example, the Eleventh Circuit upheld the exercise of jurisdiction over a claim of fraud against out-of-state defendants who had no direct contact whatsoever with the forum state because they chose to do business with the forum resident, received a benefit from that business; authorized an out-of-forum insurance broker to issue the allegedly fraudulent insurance policy binder to the forum residents, and received insurance commissions. In *Janmark, Inc. v. Reidy,* a case involving an intentional business tort of interference with prospective economic advantage, the

Seventh Circuit stated that after *Calder,* "there can be no serious doubt ... that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor." 132 F.3d 1200, 1202 (7th Cir.1997). While other circuits have questioned the Seventh Circuit's sweeping assertion in *Janmark, see e.g., Noonan v. Winston Co.,* 135 F.3d 85, 90–91 (1st Cir.1998) (denying specific personal jurisdiction over defamation claim because plaintiff could not show that defendants acted with sufficient intent to cause injury in Massachusetts, i.e., intentionally directing an act, tortious or otherwise, toward the forum state); *Imo Indus., Inc. v. Kiekert AG,* 155 F.3d 254 (3d Cir. 1998) (finding that the Seventh Circuit interpreted *Calder* too broadly and holding that personal jurisdiction was lacking in a business tort case, absent evidence that defendant expressly aimed its tortious conduct at forum state), intentional fraud directed at a plaintiff in a particular forum can suffice to submit a defendant to personal jurisdiction in the forum state. *See Bancroft & Masters, Inc. v. Augusta Nat'l Inc.,* 223 F.3d 1082, 1087–88 (9th Cir.2000) (concluding that "express aiming" encompasses wrongful conduct individually targeting a known forum resident, that this conduct was sufficient for purposeful availment, and that the relatedness requirement was met because the contacts constituting purposeful availment gave rise to the current action); *Metro. Life Ins. Co. v. Neaves,* 912 F.2d 1062, 1065 (9th Cir. 1990) (holding that an out-of-forum resident could be haled into a forum on the basis of a fraudulent letter she sent outside the forum to an insurance company, stating that "[t]he critical factor was that in sending the letter, the defendant was 'purposely defrauding' the [plaintiff in the forum]"); *Guidry v. United States Tobacco Co. Inc.,* 188 F.3d 619, 630 (5th Cir.1999) (finding minimum contacts under *Calder*

where tobacco-defendants made false misrepresentations of facts concerning tobacco products that it knew would have potentially devastating effects on in-forum resident); *Preferred RX, Inc. v. Am. Prescription Plan, Inc.*, 46 F.3d 535, 551 n. 9 (6th Cir.1995) (while resolving the issue of personal jurisdiction on procedural grounds, pointing out that, under *Calder*, the court had reservations with defendants' argument that the court lacked jurisdiction because the out-of-state defendants "targeted" the in-forum defendant and knew that the results of their conduct would cause injury to the in-forum defendant).

In a helpful opinion, the Third Circuit distilled the three principal findings of *Calder* as follows:

> First, the defendant committed an intentional tort. Second, the forum was the focal point of the harm suffered by the plaintiff as a result of that tort. Third, the forum was the focal point of the tortious activity in the sense that the tort was "expressly aimed" at the forum. Essential was a corollary finding that the defendants knew that the "brunt" of the injury caused by their tortious acts would be felt by the plaintiff in the forum.

*Imo*, 155 F.3d at 261. However, the Third Circuit cautioned, "The mere allegation that the plaintiff feels the effect of the defendant's tortious conduct in the forum because the plaintiff is located there is insufficient to satisfy *Calder*." 155 F.3d at 263.

The First Circuit has not yet had the occasion to address directly allegations of a fraudulent misrepresentation, expressly aimed at a resident of the forum state that causes harm in the forum state.[1]

## B. Stream of Commerce Cases.

In the product liability area, the Supreme Court has held that a nonresident defendant may be subject to specific jurisdiction under a stream of commerce theory even if his actions giving rise to the suit occurred outside the forum state and he had no direct contact with the plaintiff. "The forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its product into the stream of commerce with the expectation that it will be purchased by consumers in the forum State." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 298, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). "But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297, 100 S.Ct. 559. *See Rodriguez v. Hughes Aircraft Co.*, 781 F.2d 9, 15 (1st Cir.1986) (in a product liability case, declining jurisdiction over the company selling two helicopters through out-of-forum bidder to Puerto Rico on the ground that the test was not "knowledge of the ultimate destination of the product but whether the manufacturer has purposefully engaged in forum activities so it can reasonably expect to be haled into court there"). In *Asahi Metal Ind. Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Justice O'Connor, writing for three other justices, held:

> The placement of a product into the stream of commerce, without more, is

---

**1.** *Massachusetts School of Law* involved claims of intentional torts but the "strand" that sewed the charges together was that defendants banded together to monopolize education.

not an act of the defendant purposefully directed toward the forum State. *Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.* But a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

*Id.* at 1032 (emphasis supplied). Under this plurality view, a plaintiff is required to show "additional conduct" directed toward the forum before finding the exercise of jurisdiction over the defendant to be consistent with the Due Process Clause. *Id.*

C. *This Case.*

■ While this case presents difficult questions under the "relatedness" step of the due process analysis, plaintiffs have met their burden of establishing relatedness in at least two ways. First, although the antique dealers made allegedly fraudulent representations to plaintiff's agent Harned outside of the forum about the quality and value of certain antiques, they knew Harned would transmit the information to the Levins in Boston, that the plaintiffs would rely on the descriptions in Massachusetts in making the purchasing decision and that the brunt of the financial injury from the alleged fraud would be suffered in Massachusetts. The tort was completed in Massachusetts where the reliance occurred and it caused damages in Massachusetts. As in *Calder,* the actual tort and injury, not just the consequences,

occurred within the forum. *Swiss Am. Bank,* 274 F.3d at 624–25 (holding that legal tort of conversion occurs where conversion takes place). *Compare Phillips Exeter Acad. v. Howard Phillips Fund, Inc.,* 196 F.3d 284, 291 (1st Cir.1999) (finding no jurisdiction where the breach of fiduciary duty occurred outside the forum); *Mass. Sch. of Law,* 142 F.3d at 36 (citing cases where the forum effects of a tort committed out of state, like negligence, did not, without more, sustain jurisdiction in the forum). The fact that the dealers did not know the ultimate destination of the antiques (i.e., Boston or Middletown) is not dispositive.

Second, plaintiffs have established that defendants released the goods to a Massachusetts shipper, knowing that the antiques were to be shipped to Massachusetts. While defendants make much of the fact that the interior designer, not the antiques dealer, arranged for the shipping, this factor is not dispositive in a stream of commerce analysis. Although the stream of commerce caselaw is usually applied in the context of a claim of product liability, one court has applied the stream of commerce analysis to a fraud claim. *See Ruiz de Molina,* 207 F.3d at 1357–58 (allowing personal jurisdiction over a fraudulent insurance claim under stream of commerce theory where out-of-forum defendants knew that the insurance was purchased by in-forum plaintiffs via an out-of-forum broker).

Under the post-*Asahi* stream of commerce cases, the Court may consider "additional conduct" in deciding whether the placement of a product into the stream of commerce is an act of the defendant purposely directed to the forum state. Here, the transmission of allegedly fraudulent statements to plaintiffs' interior designer knowing he would bring them into the forum to describe, market, and promote

the antiques to forum residents constitutes the "additional conduct" necessary to support personal jurisdiction. This case is not simply a single, spontaneous fortuitous sale of a product out of state to the agent of a resident of the forum. Rather, defendants deliberately solicited the sales by a forum resident prior to shipment—at least with respect to the sales in 2000. This is sufficient to support personal jurisdiction under the stream of commerce theory.

### 4. *Purposeful Availment*

█ The purposeful availment test requires consideration of whether the defendant's contacts with the forum represent a purposeful availment of the privilege of conducting activities in the forum, thereby involving the benefits and protections of its laws in making the defendant's involuntary presence in the state courts foreseeable. *See Phillips Exeter Acad.*, 196 F.3d at 292.

█ This case fits neatly into the "expressly aiming" caselaw following *Calder*. The defendants allegedly committed an intentional tort, the forum was the focal point of the alleged harms suffered by plaintiffs, and the alleged tort was expressly aimed at the forum. While the Court is constrained by *Swiss Am. Bank* from even considering the effects of the tortious conduct until after the relatedness prong has been established, this caselaw is directly relevant to "purposeful availment." When all reasonable inferences are drawn in favor of jurisdiction, defendants reasonably could be expected to be haled into court in Massachusetts because they knew that the ultimate purchasers were forum residents

and that the antiques would be shipped to the forum either permanently or en route to Rhode Island.

### 5. *Gestalt–Factors*

█ Next, the Court must examine the "gestalt" factors to determine whether the exercise of personal jurisdiction offends "traditional notions of fair play and substantial justice." Plaintiffs' interest as consumers in obtaining relief in Massachusetts is strong, and their choice of forum is entitled to deference. None of the defendants has demonstrated any undue burden arising from being forced to litigate in Massachusetts. The state's interest in obtaining effective resolution of allegations of fraud in Massachusetts is compelling. I see nothing in the assertion of jurisdiction under the Massachusetts long-arm statute to offend due process.

### IV. CONCLUSION

The motion to dismiss Dalva Brothers, Foster–Gwin and Hardy is **DENIED**.

**September 17, 2003.**

*REPORT AND RECOMMENDATION ON MOTIONS TO DISMISS FOR WANT OF IN PERSONAM JURISDICTION*

COHEN, United States Magistrate Judge.

### I. INTRODUCTION:

Plaintiffs, Mark and Becky Levin (hereinafter "Levins") bring this twenty count complaint against six defendants.[1] These

---

1. Count 1 alleges Intentional Misrepresentation/Fraud against all defendants; Count 2 alleges Negligent Misrepresentation against all defendants; Count 3 alleges Breach of Contract against Harned; Count 4 alleges Breach of the Covenant of Good Faith and Fair Dealing against Harned; Count 5 alleges Breach of Contract against Dalva; Count 6

alleges Breach of the Covenant of Good Faith and Fair Dealing against Dalva; Count 7 alleges Breach of Contract against Foster–Gwin; Count 8 alleges Breach of the Covenant of Good Faith and Fair Dealing against Foster–Gwin; Count 9 alleges Breach of Contract against Nelson; Count 10 alleges Breach of the Covenant of Good Faith and Fair Deal-

six defendants were, to varying degrees, involved in the interior decorations of plaintiffs' homes. Five of the defendants have filed Motions to Dismiss alleging a lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(B)(2). Those motions, in turn, were referred to this court for report and recommendation pursuant to the provisions of Rule 2(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts.[2]

## II. FACTS:

The Levins reside in Boston, Massachusetts, and have a vacation home in Middletown, Rhode Island. (Plaintiffs' First Amended Complaint, docket #2; ¶ 12). The Levins hired defendant Roger Harned ("Harned") as their interior designer. (*Id.* at ¶ 13). Harned works out of his home in Bolinas, California under the business name Roger Harned Designs. (*Id.* at ¶ 3).

On or around October 23 and 24, 2000, Harned traveled to Boston to meet with the Levins at their Boston residence in order to discuss Harned's interior design recommendations. (*Id.* at ¶ 17). At this meeting Harned presented to the Levins

photographs and descriptions of antiques. The photographs and accompanying descriptions were provided to Harned by five antique dealers. (*Id.*).

These five antique dealers ("antique dealers") are presently Harned's co-defendants.[3] Each of the five antique dealers has filed separate motions to dismiss pursuant to Fed.R.Civ.P. 12(B)(2), alleging lack of personal jurisdiction.[4] Relying upon both Harned's representations and his co-defendant's descriptions, the Levins authorized, through Harned, the purchase of antiques costing nearly $5 million dollars. (*Id.* at ¶ 17—18).

The Levins contend that the antiques they purchased were of substantially diminished value, grossly overpriced and generally, contrary to that which they were purported to be. Plaintiffs contend that this court has *in personam* jurisdiction over each of the moving defendants based on general jurisdiction concepts, or specific jurisdiction concepts. The following relevant undisputed facts delimit the five antique dealers' respective contacts with the Commonwealth of Massachusetts in terms of both general jurisdiction concepts and specific jurisdiction concepts.[5]

---

ing against Nelson; Count 11 alleges Breach of Contract against Hardy; Count 12 alleges Breach of the Covenant of Good Faith and Fair Dealing against Hardy; Count 13 alleges Breach of Contract against Newel; Count 14 alleges Breach of the Covenant of Good Faith and Fair Dealing against Newel; Count 15 alleges Breach of Fiduciary Duty against Harned; Count 16 alleges Money Had and Received against all defendants; Count 17 alleges Unjust Enrichment against all defendants; Count 18 alleges Negligence against Harned, Count 19 alleges Negligence against Dalva, Foster–Gwin, Nelson, Hardy, and Newel; and Count 20 alleges Unfair and Deceptive Trade Practices pursuant to Mass. Gen.L. c. 93A against all defendants.

**2.** After the initial referral, plaintiffs moved for jurisdictional discovery. That motion was al-

lowed by this court to a limited extent by Order dated November 27, 2001.

**3.** Dalva Brothers, Inc. ("Dalva"), Foster–Gwin, Inc. ("Foster–Gwin"), John J. Nelson Antiques ("Nelson"), Ed Hardy Antiques ("Hardy"), Newel Art Galleries ("Newel").

**4.** Docket No. 07 for Dalva, No. 14 for Hardy, No. 23 for Foster–Gwin, No. 20 for Nelson, and No. 36 for Newel.

**5.** Pursuant to Fed.R.Civ.P., Rule 12(b)(2), the antique dealers have filed five separate motions to dismiss. There are varying standards available to the district court in determining a 12(b)(2) motion to dismiss. The "prima facie" standard, which this court now utilizes, is the most conventional. *Daynard v. Ness, Motley, Loadholt, Richardson & Poole*, 290

## Dalva

Dalva Brothers, Inc. ("Dalva") is a New York corporation with a principal place of business New York, New York. (First Amended Complaint, docket # 2, ¶ 4). Dalva is not authorized to do business in the Commonwealth of Massachusetts. (David Dalva II Affidavit "Dalva Affidavit", docket # 9, ¶ 5). Dalva has no employees or agents in the Commonwealth, nor does it own personal or real property in Massachusetts. (*Id.*)

### A. Dalva—Specific Jurisdiction Contacts

The Levins maintain that Dalva has been transacting business in Massachusetts. The Levins point to sales in 1997[6], 1999[7], and 2000[8] where Dalva allegedly knowingly sold antiques to the Levins. In support of this assertion the Levins point to delivery receipts. The delivery receipts might be probative of a knowing sale from Dalva to Massachusetts if the Levins can establish that Dalva knew the goods were being shipped to Massachusetts. However, the delivery receipts are from a trucking company, Muldoon. (Dalva Affidavit,

docket # 9, Exhibits L, M & N). While the Levins correctly point out that the delivery receipt states the sales are from Dalva in New York, to be delivered to either Levin in Boston (Exhibit L), or Service Solutions in Avon, MA (Exhibits M & N), nothing on these receipts from Muldoon, an independent third party trucking company, indicates that, once picked up at Dalva's, Dalva itself had any knowledge of the eventual place of delivery. Muldoon simply picked up a sale of goods from Dalva. These receipts do not indicate that Dalva ever knew of their delivery destination.

The 1997 product receipt from Dalva does state in relevant part: "MERCHANDISE DELIVERED ON CONSIGNMENT TO ____Mr. & Mrs. Levin (**Roger Harned**)" (emphasis in original) (*Id.*, Exhibit L). While the other product receipt from Dalva states in relevant part: "MERCHANDISE DELIVERED ON CONSIGNMENT TO ____ROGER HARNED, MULDOON MOVING, AVON MA 02322" (*Id.*, Exhibit M).[9]

The Levins point to several exhibits as evidencing a Massachusetts connection

---

F.3d 42, 50 (1st Cir.2002); *see also, Boit v.Gar-Tec Products, Inc.*, 967 F.2d 671, 675 (1st. Cir.1992). Under the prima facie standard of review, this court accepts all facts affirmatively alleged by the Levins and construes them in the light most favorable to the Levins' jurisdictional claims. *Id.* If the defendants put forward additional uncontradicted facts, those uncontradicted facts will also be considered. *Id.*

6. While this sale is not referenced in the Plaintiff's First Amended Complaint, there is evidence of this sale in the record. See (Dalva Affidavit, docket # 9, ¶ 9), (Dalva Affidavit, docket # 9, Exhibit C).

7. Plaintiff's First Amended Complaint, docket # 2, ¶ 26

8. Plaintiff's First Amended Complaint, docket # 2, ¶ 23

9. The Levins state that the check given to Dalva Brothers as payment for their 2000 items specifically states "Levins" directly above the heading "description". While they have not pointed this court to an exhibit in support of this contention, this court believes they may be referring to Exhibit K attached to Dalva's Affidavit, docket # 9. While exhibit K is an illegible photocopy and this court does not actually "see" the name "Levins" on this exhibit, this court has seen numerous other checks from Harned—to an antique seller, and the word "Levins" directly above the heading "description" are found there. This court assumes that to be the case here as well. As stated in reference to· other sellers, the word "Levin" written in the description section of the check bears no indication on the face thereof that the sale was to be made to the "Levins" who resided in Massachusetts.

when in fact they do not. Exhibit C, attached to Dalva Affidavit, docket # 9, is a quotation memo that has the name "Roger Harned Design" on it—no mention of the Levins and no address. Exhibits D & E, attached to Dalva Affidavit, docket # 9, are sales invoices which state: "SOLD TO Roger Harned P.O.Box 95 Bolinas, CA 94924". Again, no mention of the Levins and the only address is California. Exhibits F & J, attached to Dalva Affidavit, docket # 9, are simply listings of antiques with corresponding prices. While Roger Harned Design is the header for both of these exhibits, neither exhibit has indications of any address, let alone one establishing a Massachusetts connection. Exhibits G, H & I, attached to Dalva Affidavit, docket # 9, are sales invoices for Roger Harned with the address of P.O. Box 95 Bolinas CA 94924. Again, no Massachusetts connection.

### B. Dalva—General Jurisdiction Contacts

Dalva sold to one other Massachusetts resident. In 1999 Dalva sold a $5,400.00 pitcher to Sidney Knafel, of Chilmark, MA. (Scibelli Affidavit, docket # 61, Exhibit C)

Dalva does not maintain its own Web site; however, it does have an internet listing, which provides Dalva's New York address and New York telephone number. (Scibelli Affidavit, docket # 61, Exhibit F). Dalva is listed on the Art and Antique Dealers League of America Web site as a member. (Scibelli Affidavit, docket # 61, Exhibit D).[10] The Art and Antique Dealers do publish a quarterly magazine, *Connoisseur's Quarterly* and Dalva is listed as a member in New York. (Scibelli Affidavit, docket # 61, Exhibit E).

### Foster–Gwin

Foster–Gwin, Inc. ("Foster–Gwin") is a California corporation, with a principal place of business in San Francisco, California. (First Amended Complaint, at ¶ 5).[11]

### A. Foster–Gwin—Specific Jurisdiction Contacts

The Levins maintain that in 1997[12], 1999[13], and in 2000[14], Foster–Gwin knowingly sold antiques to the Levins. All three 1997 sales invoices (i) January 20, 1997, sales invoice for $118,800.00, (ii) July 30, 1997, sales invoice for $51,000.00, (iii) and an October 6, 1997, invoice for $21,000.00 are addressed to Roger Harned P.O. Box 95 Bolinas California 94924.

---

10. As with the case relating to defendant Foster–Gwin, see note 25, *infra*, it is settled that, in analyzing either general or specific jurisdictional contacts, only those contacts which preceded the filing of the complaint will count. *Noonan v. Winston*, 135 F.3d 85, 93, n. 8 (1st Cir.1998); *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 619 n. 4 (1st Cir.2001).

Plaintiffs filed their first amended complaint on August 24, 2001. It is clear from the Scibelli Affidavit, docket # 61, ¶ ¶ 5 and 7 and Exhibits D and F, submitted by plaintiffs in support of their claim of jurisdiction, that those internet listings post-dated the filing of the amended complaint in this case, and, therefore, these alleged contacts do not count in the jurisdictional calculi.

11. In Foster–Gwin's Memorandum of Law, Foster–Gwin contends that it does not own property of any kind in Massachusetts and that no Foster–Gwin officer, director or employee resides in Massachusetts. (Foster–Gwin's Memorandum of Law, docket # 23, p. 4, ¶ 4) citing (Gwin Dec. ¶¶ 6,7). Plaintiffs do not contend to the contrary.

12. While this sale is not referenced in the Plaintiff's First Amended Complaint, there is evidence in the record of such sale. (Scibelli Affidavit, docket # 63, Exhibit C).

13. Plaintiff's First Amended Complaint, docket # 2, ¶ 32

14. Plaintiff's First Amended Complaint, docket # 2, ¶ 30

(Scibelli Affidavit, docket # 63, Exhibit C). Additionally, the January 20, 1997, invoice does state under shipping instructions "Shipment to Boston; will hold until advised"; and the July 30, 1997, invoice states "Ship to Boston address as advised."

The 1999—$36,500.00 and the 2000 - $ 312,200.00 sales invoices are also addressed to Roger Harned P.O. Box 95 Bolinas California 94924 with the notation "shipment to Boston will hold until advised." (Scibelli Affidavit, docket # 63, Exhibits D & E).

Foster–Gwin had an understanding that Harned's purchases were for an east coast client named Levin, and that the items were to be shipped to Boston, but then and there to be transshipped to a Rhode Island house. (Scibelli Affidavit, docket # 63, Exhibit A p 1–4).

The checks to pay for these antiques were drawn on Roger Harned Design. The address on the checks is P.O. Box 95, Bolinas, CA 94924. The checks do bear the notation "Levin" (albeit almost unintelligibly) under the description section of the check. (Scibelli Affidavit, docket # 63, Exhibit F).

### B. Foster–Gwin—General Jurisdiction Contacts

Foster–Gwin sold to other Massachusetts residents. In 1999 Foster–Gwin sold Rococo Dutch men to Paraffin Interiors. There are two addresses on the invoice of Paraffin Interiors and it is not clear from the invoice which of the two addresses the shipment was to be sent. The two addresses are (i) 11 Bridge Street in Sunderland MA 01375(ii) 203 South Beach Road Hobe Sound FL 33455. (Scibelli Affidavit, docket # 63, Exhibit H). In 2000 Foster–Gwin sold a Baroque Swan to Alan Granby of Hyannis, MA 02601. (*Id.*) In 2000 Foster–Gwin purchased items from CRN, a Cambridge Auctioneer. (Scibelli Affidavit, docket # 63, Exhibit I).

Exhibit M of the Scibelli Affidavit, docket # 63, is a list of seven names of Massachusetts residents. The Scibelli affidavit maintains this list of seven names "is a true and accurate copy of a mailing list produced by Foster–Gwin during the discovery in this matter." (*Id.* at p. 2 ¶ 14). Neither the affidavit nor the exhibit itself suggest when nor how often something is mailed nor for that matter what might be being mailed.

Foster–Gwin has advertised in the following national magazines: *Architectural Digest, Antiques Magazine, Elle Decor, Connoisseur's Quarterly, Artnet,* and *Town and Country.* (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 22—24).

While Foster–Gwin does not maintain it's own Web site (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 16), Foster–Gwin does advertise some of its inventory on other antique Web sites, *i.e.,* Art League and Artnet.com. (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 8–16). Additionally, Foster–Gwin advertised inventory on Web sites for specific antique shows with multiple vendors, *i.e.,* The Winter Antique Show in New York. (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 15).

### Nelson

John J. Nelson Antiques ("Nelson") is a California corporation with a principal place of business in Los Angeles, California. (First Amended Complaint, at ¶ 6). Nelson is not authorized to do business in Massachusetts. He does not have employees or agents within the Commonwealth, nor does he own or lease any property there. (Nelson Affidavit, docket # 22. ¶ 5).

### A. Nelson—Specific Jurisdiction Contacts

The Levins maintain that Nelson sold antiques to the Levins in Massachusetts. Yet Nelson never met or communicated with the Levins. (*Id.* ¶ 10). All purchases from Nelson occurred via Harned who never identified his clients by name, instead referring to them as his "affluent" clients "from the East Coast." (*Id.* ¶ 10). Nonetheless, the Levins point to three sales; two in 1997 [15] and one in 2000 [16], to support their contention.

There is no language in any of the three sales invoices provided to this court which suggest a Massachusetts connection. The first invoice is dated January 23, 1997. This January 23, 1997, invoice is made out to Roger Harned Design. The address, and only address, on this invoice, is very clearly P.O. Box 95, Bolinas, California, with a zip code which appears to read 94924. (Scibelli Affidavit, docket # 67, Exhibit B). The second invoice is dated July 30, 1997. This July 30, 1997, invoice, again, is made out to Roger Harned Design and, again, the address, and only address, on this invoice, is very clearly, P.O. Box 95, Bolinas, California 94924. (*Id.*) The third and final invoice the Levins point to is dated October 27, 2000. Yet, again, the invoice is addressed to Roger Harned Design. The address on this invoice is P.O. Box 15, Bolinas, California. (Scibelli Affidavit, docket # 67, Exhibit C).

The check to pay for these antiques is drawn on Roger Harned Design. The address on the check is P.O. Box 95, Bolinas, CA 94924. The check for three hundred nineteen thousand dollars is signed by Roger Harned. Again, there is absolutely no Massachusetts connection reflected on or apparent from a visual view of this check. (Scibelli Affidavit, docket # 67, Exhibit A). To be sure, the word "Levin 819" is written in the description section of the check. There is no indication on the face of this check of any knowing connection between "Levin 819" and Massachusetts.

The Levins point to faxes that Nelson received from Roger Harned in September or October of 2000. (Scibelli Affidavit, docket # 67, Exhibit D). On the first page fifth paragraph of this exhibit is the notation: "1. Round stone table/ or wood to replace Boston—42″D/or bird table to replace original in pictures." The words "to replace Boston –42″D/or bird table" is not connected, on the face of this fax, to any indication of a geographic location. It could be a description of a piece or style of furniture. In fact, right next to the words "to replace Boston –42 D/or bird table" are the words "Portugese Arm Chair". The words "Portugese Arm Chair" appear to this court to be descriptive of a style of furniture and not a potential jurisdiction for litigation. (Scibelli Affidavit, docket # 67, Exhibit D).

On the third page of a fax that is entitled Gray Craig Antiques List—Roger Harned,[17] there are some handwritten notations which appear to supplement the word-processed text. This handwritten notation states: "Arrive Boston, Sun, Oct 22—Ritz–Carlton Boston 1–617–536–5700 15 Arlington St. Boston, Ma. 02117" (Scibelli Affidavit, docket # 67, Exhibit D). This phone number is for the Ritz–Carlton hotel. (Plaintiffs' Opposition to Nelson's

---

**15.** While the First Amended Complaint points to the date of sale as February, 1999, Levins acknowledge the actual sale as occurring in 1997—a date which comports to the sales invoices.

**16.** Plaintiff's First Amended Complaint, docket # 2, ¶ 38 & ¶ 39

**17.** Scibelli Affidavit, Docket # 67, Exhibit D, page 1.

Motion to Dismiss, docket # 66, p. 5). Directly underneath this Boston address is a California address: "Roger Harned 415–868–1232 60 Marin Way, Bolinas, CA. 94924". (Scibelli Affidavit, docket # 67, Exhibit D).

The Levins state, "By his own admission, John J. Nelson sent photographs of certain furniture to Harned at this Boston address, with the expectation that he would review them with his clients." (Plaintiffs' Opposition to Nelson's Motion to Dismiss, docket # 66, p. 5). In support of this statement the Levins' cite to the Nelson Affidavit ¶ 13. Yet ¶ 13 of the paragraph states: "If I found anything while I was in France, could I please FedEx some photographs of whatever I found that might meet his requirements. And he gave me a FedEx address at the Ritz–Carlton with a date to send him if I found anything" (Nelson Affidavit, docket # 67, ¶¶ 13–17, emphasis added). This portion of the Nelson Affidavit, does not support the Levins' contention that "By his own admission, John J. Nelson sent photographs of certain furniture to Harned at this Boston address..." (Plaintiffs' Opposition to Nelson's Motion to Dismiss, docket # 66, p. 5). The language of the Nelson Affidavit is clearly a request to perform a future function, *i.e.*, if Nelson found an interesting piece of furniture please send a picture.

To be sure, in the Nelson Affidavit, in a portion not cited by the Levins, docket # 22, page 3, paragraph 3, Nelson does state:

I sent via Federal Express courier the photographs of the tables to Mr. Harned. I understood that Mr. Harned would be in Massachusetts to receive the photographs because Mr. Harned in-

formed me that he would be staying with some friends there. I also understood that Mr. Harned planned to meet with his clients after receiving these photographs, but I did not know where on the East Coast he intended to meet with them, or where they were to be installed.

Prior to sending the European photographs, Nelson did provide approximately fifty photographs of various items to Harned, when Harned entered Nelson's California shop in search of antiques. (*Id.* ¶ 11–12).

## B. Nelson—General Jurisdiction Contacts

Nelson does not advertise in any national publications nor any East Coast publications, nor any publications specific to Massachusetts. (*Id.*, ¶ 7). Nelson has neither solicited business nor purchased merchandise in Massachusetts. (*Id.* ¶ 6). Nelson does not have an internet Web site. (*Id.* ¶ 9).

### Hardy

Hardy is a California corporation with its principal place of business in San Francisco, California. (Declaration of Boutell, docket # 16, ¶ 2). Hardy is not incorporated in Massachusetts, none of its officers or employees reside in Massachusetts. Hardy does not possess any Massachusetts property, either real or personal. (*Id.*).

## A. Hardy—Specific Jurisdiction Contacts

In 1999, Harned informed Kendra Boutell ("Boutell"), head of sales at Hardy, that Harned was purchasing items from Hardy for the Levins in Boston.[18] (Boutell Deposition, Exhibit 2, p. 16, of Whiteley

---

18. This sale is also referenced in the Plaintiff's Complaint. (Plaintiff's First Amended Complaint, docket # 2, ¶ 47)

Affidavit, docket # 69). In 2000, Harned informed Boutell that Harned was purchasing items from Hardy for the Levins in Rhode Island. (Boutell Deposition, Exhibit 2, p. 6, of Whiteley Affidavit, docket # 69).

### B. Hardy—General Jurisdiction Contacts

Hardy's primary clientele is on the West Coast; however, some attempts have been made to target the East Coast. Hardy mailed catalogs to a Massachusetts designer, William Hogins. (Boutell Deposition, Exhibit 2, p. 21, of Whiteley Affidavit, docket # 69). Despite the mailed catalog, Hogins has not done business with Hardy within the last five years. (Boutell Deposition, Exhibit 2, p. 22, of Whiteley Affidavit, docket # 69).

Hardy maintains a Web site. The Web site has never allowed someone accessing the Web site to make a direct purchase from the Web site. (Hardy Deposition, Exhibit 1, p. 26, of Whiteley Affidavit, docket # 69). The Web site states: "Although Ed Hardy San Francisco is open to the public, we cater almost exclusively to the design trade worldwide." (Exhibit 4, of Whiteley Affidavit, docket # 69). However, the Web site does provide a consumer with the ability to leave their email address or phone number so that Hardy may contact them. (*Id.*). Additionally, Hardy uses third party Web sites like Circline.com, and Artnet.com. Levins maintain that Hardy made "sales" through the third party Web site Circline.com; however, in support of this contention they point to Exhibit 5 attached to the Whiteley Affidavit, docket # 69. Nothing in Exhibit 5 supports the contention that Hardy made a sale through it. Exhibit 5 is merely a photocopy of the Circline.com web page. It doesn't suggest the sale of any

item, let alone one from Hardy to a consumer in Massachusetts.

Hardy does advertise in the San Francisco Antique Show catalog. The catalog is distributed nationally. (Boutell Deposition, Exhibit 2, p. 29, of Whiteley Affidavit, docket # 69).

### Newel

Newel Art Galleries, Inc. ("Newel") is a New York corporation with a principal place of business in New York, New York. (Plaintiffs' First Amended Complaint, docket # 2, ¶ 8). Newel is not authorized to do business in the Commonwealth of Massachusetts. (Baer Affidavit, docket # 37, ¶ 5). He neither employs, has agents, owns nor leases property in Massachusetts. (*Id.*).

### A. Newel—Specific Jurisdiction Contacts

The Levins maintain that Newel sold them various items which were misrepresented as rare and valuable antiques. All purchases were made by Harned from Newel's New York gallery. (First Amended Complaint, at ¶ 50). Harned had browsed Newel's New York gallery in October 2000. (Baer Affidavit, p. 75, attached to Whiteley Affidavit, docket # 71, exhibit 30). At that time he requested photographs and descriptions of various objects he was considering purchasing for a house in Rhode Island. (Baer Affidavit, p. 77, attached to Whiteley Affidavit, docket # 71, exhibit 30). Harned next met with the Levins in Boston, showed them the photographs and accompanying descriptions provided to Harned by Newel, and the Levins then authorized the purchases. (First Amended Complaint, at ¶¶ 49—51). These purchases were for the Levin's Middletown, Rhode Island home. (First Amended Complaint, at ¶ 51).

The Levins provide a sales invoice for the Newel purchases in question. (White-

ley Affidavit, docket # 71, exhibit 27). Under the heading "SOLD TO" This invoice clearly states that the various items were sold to:

Roger Harned Design, at PO Box 95, 60 Marin Way, Bolinas, CA 94924, tel 415–868–1232, fax 415–868–1636, www.harneddesign.com.

(*Id.*) The job description does state: "Job: Levin/Newport". There is nothing in this sales invoice that indicates a Massachusetts connection.

Harned made the shipping arrangements. (Newel Affidavit, docket # 37, ¶ 13). The delivery receipt / bill of lading indicates the items were picked up from Newel in New York and shipped to Service Solutions c/o Muldoon Warehouse in Avon, Massachusetts. (Whiteley Affidavit, docket # 71, exhibit 28).

The check to pay for these Newel antiques is drawn from Roger Harned Design. The address on the check is P.O. Box 95, Bolinas, CA 94924. The check for five hundred thirty-seven thousand nine hundred and twenty dollars is signed by Roger Harned. (Whiteley Affidavit, docket # 71, exhibit 29). Again, there is absolutely no Massachusetts connection reflected or apparent from a viewing of this check. To be sure, the word "Levin 819" is written in the description section of the check. (*Id.*) There is no indication on the face of this check of any knowing connection between "Levin 819" and Massachusetts.

### B. Newel—General Jurisdiction Contacts

The Newels have made sales to Massachusetts outside of their alleged relationship with the Levins. In 1996 Newel sold $10,200 worth of merchandise to Lisa Vandenburg at 410 Boylston Street, Boston MA 02116. (Whiteley Affidavit, docket # 71, exhibit 1).

In 1997 Newel sold to three separate designers in Massachusetts: approximately $85,000.00 to Veronique Louvet at 224 Clarendon Street Boston, MA 02116 (Whiteley Affidavit, docket # 71, exhibit 2); approximately $41,840.00 to Judith Ross & Co., Inc. at 2 Newbury Street Suite 5, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibit 3); approximately $6,800.00 to Repertoire, Attn: Celeste Cooper, at 560 Harrison Ave., Suite # 403, Boston MA 02118 (Whiteley Affidavit, docket # 71, exhibit 4).

In 1998 Newel sold to four separate designers in Massachusetts: approximately $43,600.00 to Judith Ross & Co., Inc. at 2 Newbury Street Suite 5, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibits 5 & 8); approximately $6,495.00 to Poetics of Space, Inc. Attn: Tim Chappell at 211 Berkeley Street, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibit 6); approximately $24,400.00 to Wyett Consulting Group Attn: Alan Wyett at 25 Fullard Rd. Weston MA 02193 (Whiteley Affidavit, docket # 71, exhibit 7); approximately $7,600.00 to Adolfo Perez Architect Attn: Tim Fryatt, 72 Langley Road, Newton MA 02459 (Whiteley Affidavit, docket # 71, exhibit 9).

In 1999 Newel sold to five separate designers in Massachusetts: approximately $38,000.00 to Saffron House Interior Design at 451 D Street, Boston MA 02210 (Whiteley Affidavit, docket # 71, exhibits 10 & 13); approximately $2,100.00 to Marcia Tinguely at 123 Chandler Street, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibit 11 & 16); approximately $3,840.00 to Leslie Heiden Design at 2 Gregian Avenue # 399, Nantucket, MA 02554 (Whiteley Affidavit, docket # 71, exhibit 12); approximately $22,000.00 to Wyett Consulting Group Attn: Alan Wyett at 25 Fullard Rd. Weston MA 02193

(Whiteley Affidavit, docket # 71, exhibit 14); and approximately $48,000.00 to Repertoire 114 Boylston Street, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibit 15).

In 2000 Newel sold to three separate designers in Massachusetts: approximately $22,690.00 to Mark LaPrade & Associates at 151 Tremont Street, Boston MA 02111 (Whiteley Affidavit, docket # 71, exhibit 17); approximately $282,000.00 to Repertoire at 114 Boylston Street, Boston MA 02116 (Whiteley Affidavit, docket # 71, exhibit 18); and approximately $22,000.00 to Saffron House Interior Design at 142 Berkely Street, Boston MA 02216 (Whiteley Affidavit, docket # 71, exhibit 19).

At no time did Newel or any representative personally solicit any of the above sales in Massachusetts. (Baer Affidavit, docket # 37, ¶¶ 16 & 17). There were no telephone calls and no travel to Massachusetts. Each transaction originated with the buyer contacting Newel in its New York City office. (Id.).

In 1999—2001, Newel has advertised in several national magazines: *Architectural Digest, Art and Auction, Town and Country, House and Garden* and *Interior Design*. Additionally, Newel has advertised in *The New York Times* newspaper. (Baer Deposition—Exhibit 30, p. 50—61, attached to Whitely Affidavit, docket # 71).

Newel does maintain a Web site. Its purpose is to offer exposure to Newel Galleries. The site, while accessible to internet users in Massachusetts, does not allow purchases directly through the Web site. For purchases, the Web site users must email Newel directly. Such email access is provided via the Newel Web site. (Baer Deposition—Exhibit 30, p. 66, attached to Whitely Affidavit, docket # 71).

### III. General Jurisdiction Analysis

 In order for *general* jurisdiction to comply with due process requirements, two criteria must be met. First, there must be *continuous and systematic* general contacts between the defendant and the forum. Second, the exercise of jurisdiction must be reasonable. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 618, 619 (1st Cir.2001). *See Also Helicopteros Nacionales De Columbia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). In ascertaining "continuous and systematic", the First Circuit, consistent with other Circuits, employs a fact specific analysis of the defendant's contacts. This fact specific analysis compares the contact in the present case with contacts in prior case law that were deemed insufficient for general jurisdiction. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 619 (1st Cir. 2001). If the level of contact in the present case does not meet the level of contact that the First Circuit has previously understood as "continuous and systematic", then this court cannot exercise general jurisdiction. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 620 (1st Cir.2001).[19]

19. More specifically, the *Swiss American Bank* court concluded (*Id.* at 620):

In determining what constitutes "continuous and systematic" contacts, our analysis is "a fact-specific evaluation" of the defendant's contacts with the forum. *Noonan,* 135 F.3d at 93. For guidance in this factual inquiry, we look to "the types of contacts deemed sufficiently continuous and systematic in other cases."

In determining reasonableness, the First Circuit also applies the so-called gestalt factors. Since this court determines that plaintiffs have not established the continuous and systematic component necessary to the establishment of general jurisdiction, there is no

## A. Continuous and Systematic Behavior

### A Sampling of Prior First Circuit Precedent

In *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 620 (1st Cir. 2001), the court held that the defendant's contacts with the United States did not meet the continuous and systematic criteria.[20] The Swiss American Bank's (hereinafter "SAB") contacts with the United States included twelve advertisements in American Way magazine, published by American Airlines. *United States v. Swiss American Bank, Ltd.*, 274 F.3d at 619.

During an unspecified time frame, SAB entered into agreements with two credit card companies. *Id.* SAB subscribed to Visa International which is a California credit card company. *Id.* SAB also entered into a licensing agreement with MasterCard International, a New York company. *Id.* Along with these agreements, SAB also had bank related activity within the United States. Prior to 1985, SAB entered into a joint venture with the Home State Savings Bank of Ohio. *Id.* In addition, SAB entered into a contract with an Arkansas company in 1996 for ATM support services. SAB also had banking relationships and accounts with four banks in New York. *Id.* In 1990, SAB was a party in an unrelated lawsuit in Florida. *Id.*

SAB had a number of additional miscellaneous business relationships in the United States. *Id.* In 1996 SAB loaned $350,000 to a Colorado company that runs an internet service. *Id.* Also in 1996, SAB allegedly had business relations with a California technology company. *Id.* In 1998, information regarding SAB was posted on three different web sites. *Id.* Finally, SAB had a business relationship with a Massachusetts resident. *Id.*

After reviewing all of the above described contact, the First Circuit court labeled these contacts as "limited and intermittent." *Id* at 620. These numerous business relationships and advertisements did not constitute the continuous and systematic behavior necessary to exercise general jurisdiction. *Id.* The court based its conclusion on contacts deemed insufficient to find jurisdiction in past cases including *Noonan v. Winston Co.*, 135 F.3d 85 (1st Cr.1998), and *Donatelli v. NHL*, 893 F.2d 459 (1st Cir.1990).

In *Noonan, supra,* the First Circuit concluded that it did not have general jurisdiction over the defendant.[21] The defendant placed telephone calls to Massachusetts and sent several faxes to Massachusetts to secure orders. *Id.* at 92. In addition, agents of the defendant traveled from England to Massachusetts on at least two occasions in an attempt to establish a business relationship. *Id.* Additionally, over a two-year period the defendant received $585,000 in purchase orders. *Id.* Yet, relying on *Donatelli v.*

occasion to determine the reasonableness of the exercise of general jurisdiction.

**20.** In *United States v. Swiss American Bank, Ltd.*, the First Circuit employed a jurisdictional analysis based on federal jurisdiction under Rule 4(k)(2), not state personal jurisdiction. Rule 4(k)(2) requires that the "parties have sufficient contacts with the United States as a whole." *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 618 (2001). The rationale set forth in that case, however, was consistent with the rationale set forth in other First Circuit cases reviewing the question of *in personam* jurisdiction of out-of-state defendants.

**21.** The First Circuit found contacts insufficient to establish general jurisdiction despite the fact that the contacts were sufficient to establish personal jurisdiction under the Massachusetts Long–Arm Statute. *Noonan v. Winston*, 135 F.3d 85 at 94.

162

*National Hockey League*, 893 F.2d 459 (1st Cir.1990), the *Noonan* court determined that the defendants' two year history with Massachusetts was far less systematic than the National Hockey League's had been in *Donatelli v. NHL. Noonan v. Winston*, 135 F.3d 85 at 93. Therefore, because there was less contact in the *Noonan* case, the court concluded that it would be unconstitutional to exercise general jurisdiction over the defendant. *Id.*

In *Donatelli v. NHL*, 893 F.2d 459 (1st Cir.1990), the First Circuit declined to exercise general jurisdiction in Rhode Island over the National Hockey League. *Donatelli v. NHL*, 893 F.2d at 471. The NHL monitors the regular-season playing schedule as well as the post-season playoffs. *Donatelli v. NHL*, 893 F.2d at 461. Of the twenty-one member association, only one member, the Boston Bruins, had contact with Rhode Island. *Id.* The NHL also adopts and enforces the by-laws of the sport, conducts an annual player draft, determines player eligibility, provides officials to referee the games, and operates a scouting network. *Id.* While the NHL performs these functions, each of the twenty-one teams is an independently owned entity. *Id.* The NHL also manages player recruitment, ticket sales, advertising arrangements, broadcasting, concession arrangements, and provides equipment. *Id.* In addition to these critical functions, each team is responsible for setting up its own exhibition games. *Id.* The Boston Bruins play one exhibition game in Rhode Island

each year. *Id.* Weighing the functions of the NHL against the functions of the individual teams, in particular, the Bruins, the First Circuit held that general jurisdiction in Rhode Island over the NHL would be unconstitutional. *Donatelli v. NHL*, 893 F.2d 459 at 471. Although the Bruins, a member of the NHL hosted exhibition games in Rhode Island for past ten years, the NHL did not have a substantial influence over the Bruins' decision to enter Rhode Island. *Id.* The court said that because the Bruins entered the market for their own benefit and the NHL did not have substantial influence on the decision to do so, general jurisdiction could not be imputed to the NHL through the Bruins activity in the forum state. *Id.*

## General Jurisdiction and the Current Defendants

### Newel

■ Newel's contacts in Massachusetts are less sufficient than those discussed in *Swiss American Bank, Noonan, Donatelli*. Given that the contacts in *Swiss American Bank, Noonan, Donatelli* were insufficient to establish general jurisdiction, it goes without saying, Newel's contacts are also insufficient to establish continuous and systematic behavior, and therefore general jurisdiction. Newel has made sales to fifteen designers in Massachusetts as well as one direct sale to a private resident.[22] These sales, which began in 1996, have amounted to a total revenue of $666,565 from Massachusetts. While the amount of revenue sustained here is greater than the $585,000 received by the defendant in *Noo-*

---

**22.** Newel made a private sale in 1996 for the amount of $10,200 to a Massachusetts resident. (Whiteley Affidavit, docket # 71, exhibit 1). In 1997 Newel sold to three separate designers in Massachusetts, receiving revenue of $133,640.00. (Whiteley Affidavit, docket # 71, exhibits 2–4). In 1998, Newel sold to four separate designers in Massachusetts for a total of $82,095.00. (Whiteley Affidavit, dock-

et # 71, exhibits 5–9) In 1999, Newel made sales totaling $113,940.00 to five separate Massachusetts designers. (Whiteley Affidavit, docket # 71, exhibits 10–16). In 2000, Newel received $326,690.00 from sales made to three separate Massachusetts designers. (Whiteley Affidavit, docket # 71, exhibits 17–19).

*nan,* the aggregate amount of contact in the present case is less than that in *Noonan.* In *Noonan,* the out-of-state defendant placed calls, sent faxes, and sent letters to Massachusetts in the course of soliciting business and securing orders. *Noonan v. Winston,* 135 F.3d at 92. In other words, the business contacts in *Noonan* were initiated from outside of Massachusetts and reached into the Massachusetts jurisdiction. In the present case, the reverse is true. Massachusetts residents left the Massachusetts jurisdiction and initiated contacts outside of Massachusetts in New York. (Baer Affidavit, docket # 37 ¶¶ 16 & 17). In addition, in *Noonan,* not only did the defendant solicit business via phone, fax, and mail, but the defendant company also sent agents to the forum state twice for the purpose of developing business relationships. *Noonan v. Winston,* 135 F.3d at 92. Here, no agent associated with Newel travelled to Massachusetts at any time. (Baer Affidavit, docket # 37 ¶¶ 16 & 17).

Newel has advertised in five national magazines [23] as well as *The New York Times.* However, in *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610 (1st Cir.2001), where the defendant placed twelve advertisements in a magazine published by an airline and had numerous business relationships, these contacts were still insufficient to exercise general jurisdiction. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 620 (1st Cir. 2001). Since Newel arguably has no business contacts with the state, these advertisements alone are insufficient to grant general jurisdiction. While Newel maintains a web site that is accessible to Mas-

sachusetts residents, the web site does not provide for direct purchases. (Baer Deposition—Exhibit 30, p. 66, attached to Whiteley Affidavit, docket # 71). In *United States v. Swiss American Bank, Ltd.,* the defendant had postings on three web sites in addition to the previously mentioned advertisements and business contacts and the court did not exercise general jurisdiction. *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 619 (1st Cir.2001). Therefore, because Newel had much less contact with Massachusetts than the defendant in *United States v. Swiss American Bank, Ltd.,* the web site is not enough contact to permit general jurisdiction. And because defendant Newel's overall contacts in Massachusetts are less continuous and systematic than those in other First Circuit cases where general jurisdiction was not found, this court concludes that plaintiffs have failed to show a basis for the exercise of general jurisdiction over Newel.

**Foster–Gwin**

■ Foster–Gwin's contacts in Massachusetts are less sufficient than those discussed in *Swiss American Bank, Noonan, Donatelli.* Since the contacts in *Swiss American Bank, Noonan, Donatelli* are insufficient to establish general jurisdiction, Foster–Gwin's contacts are also insufficient to establish continuous and systematic behavior and therefore general jurisdiction. Foster–Gwin is a California company with its principal place of business in San Francisco, California. Foster–Gwin made sales in 1999 and 2000 to Massachusetts residents and made a purchase in 2000 from a Massachusetts auctioneer.[24] These sales, which only totaled

---

23. Newel has advertised in *Architectural Digest, Art and Auction, Town and Country, House and Garden,* and *Interior Design.* (Baer Deposition—Exhibit 30, p. 50–61, attached to Whiteley Affidavit, docket # 71).

24. In 1999 Foster–Gwin sold antiques to a resident in the amount of $11,600.00. (Scibelli Affidavit, docket # 63, Exhibit H). In 2000 Foster–Gwin sold antiques to a resident in the amount of $4,000.00. (Scibelli Affida-

$15,600.00, are far less substantial than those considered insufficient in *Noonan*. In *Noonan*, the defendant received $585,000 in revenue as a result of soliciting business in the forum state. *Noonan v. Winston*, 135 F.3d at 92. If there was not sufficient contact in *Noonan* based on that amount of money and business conduct, then there cannot be sufficient contact here.

During jurisdictional discovery, Foster–Gwin produced a mailing list with seven names of Massachusetts residents. (Scibelli Affidavit, docket # 63, Exhibit M). The record does not provide information on the frequency of mailings or what might have been mailed. Indeed, it is not even clear that this mailing list existed prior to the filing of the complaint and amended complaint in this action.[25] However, if the *Noonan* court could not exercise general jurisdiction over the defendant, then this court cannot exercise jurisdiction over Foster–Gwin. The defendant in *Noonan* consistently sent information into the forum state via telephone, letters, and faxes. *Noonan v. Winston*, 135 F.3d 85 at 92.

Foster–Gwin's possible mailings[26] to seven residents is far less continuous and systematic. Foster–Gwin has advertised in six national magazines as well as some third party web sites.[27] Following established First Circuit precedent, if twelve advertisements in an airline magazine, coupled with numerous other business contacts, were deemed insufficient, than Foster–Gwin's six advertisements along with two sales are insufficient as well because the contact is less continuous and systematic than that in *United States v. Swiss American Bank, supra*. Therefore, because defendant Foster–Gwin's contacts in Massachusetts are far less than those in other First Circuit cases where general jurisdiction was not found, this court concludes that plaintiffs have failed to show a basis for the exercise of general jurisdiction over Foster–Gwin.

### Dalva

■ Dalva's contacts in Massachusetts are less sufficient than those discussed in *Swiss American Bank, Noonan*, and *Do-*

---

vit, docket # 63, Exhibit H). In 2000 Foster–Gwin purchased antiques from a Massachusetts auctioneer for the price of $35,000.

As to these latter purchases from a Massachusetts auctioneer, it is settled that "mere purchases," even if made regularly, are not sufficient to subject a defendant to general personal jurisdiction where the cause of action is not related to those purchases. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408–409, 418, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

**25.** It is settled that, in analyzing either general or specific jurisdictional contacts, only those contacts which preceded the filing of the complaint will count. *Noonan, supra*, at 93, n. 8; *Swiss American Bank, supra*, at 619 n. 4.

Plaintiffs filed their first amended complaint on August 24, 2001. It appears from the Scibelli Affidavit, docket # 63, Exhibit M, submitted by plaintiffs in support of their

claim of jurisdiction, that that mailing list bears a date (as partially shown on the top of that exhibit) of December 2001. It therefore does not even count. Moreover, even if this court's view of the date on Exhibit M is incorrect, plaintiffs have not shown the date of this mailing list, and, accordingly, have not established that it should count as a relevant contact.

**26.** If, indeed, any mailings were made prior to the time the plaintiffs filed their amended complaint, see note 25, *supra*.

**27.** Foster–Gwin has advertised in the following magazines: *Architectural Digest, Antiques Magazine, Elle Decor, Connoisseur's Quarterly, Artnet*, and *Town and Country*. (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 22–24). Foster–Gwin has advertised on the Art League web site as well as Artnet.com. (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 8–16).

*natelli.* Since the contacts in *Swiss American Bank, Noonan, Donatelli* are insufficient to establish general jurisdiction, Dalva's contacts are also insufficient to establish continuous and systematic behavior and therefore general jurisdiction. Dalva is a New York corporation with its principal place of business in New York City. Dalva made sales to the Levins in 1997, 1999, and 2000 and used a third-party trucking company based out of Massachusetts to deliver the goods.[28] The Dalva sales invoices state that the goods were sold to Roger Harned, a resident of California, and not the Levins, residents of Massachusetts. (Dalva Affidavit, docket # 9, Exhibits D & E). Dalva has only sold goods to one other Massachusetts resident totaling $5,400.00 in revenue. (Scibelli Affidavit, docket # 61, Exhibit C). This is significantly less revenue than the defendant in the *Noonan* case received. In addition, the defendant in *Noonan* had more contact with the forum state since it telephoned, faxed, and even travelled to the state. *Noonan v. Winston,* 135 F.3d at 92. Here, there is no evidence in the record that Dalva performed any of these activities.

While Dalva does not have its own website, it does have an internet listing providing its New York address and phone number. (Scibelli Affidavit, docket # 61, Exhibit F). Dalva is only advertised in one magazine and listed to be in New York. (Scibelli Affidavit, docket # 61, Exhibit E). Again, these contacts are less continuous and systematic than contacts deemed insufficient to grant jurisdiction in *United States v. Swiss American Bank,* 274 F.3d 610, 620 (1st Cir.2001). Dalva's three sales to the Levins, one advertise-

ment, and use of a third-party trucking company are more limited and intermittent than Swiss American Bank's twelve advertisements, contracts, participation in a non-related lawsuit, and other business contacts with the United States. The defendant Dalva's contact here is also substantially more minimal than the NHL's ten-year period of exhibition games in *Donatelli* and the First Circuit there refused to exercise general jurisdiction over the defendant holding that the defendant did not have a substantial effect on any activity occurring in the forum state. Finally, unlike the defendant in *Noonan* who telephoned, faxed, and wrote letters to the forum state to solicit business, there is nothing in the record to indicate that Dalva even knew of any connection to Massachusetts. Therefore, because defendant Dalva's contacts in Massachusetts are less than those in other First Circuit cases where general jurisdiction was not found, this court should not exercise general jurisdiction over Dalva.

**Hardy**

 Hardy's contacts in Massachusetts are less sufficient than those discussed in *Swiss American Bank, Noonan, Donatelli.* Since the contacts in *Swiss American Bank, Noonan, Donatelli* are insufficient to establish general jurisdiction, Hardy's contacts are also insufficient to establish continuous and systematic behavior and therefore general jurisdiction. Hardy is a California company with its principal place of business in San Francisco. Hardy has mailed catalogs to one Massachusetts designer but has not done business with that particular designer within the past five years. (Boutell Deposition, Exhibit 2, p. 22, of Whiteley Affidavit, docket # 69). While Hardy maintains its own website, it

---

**28.** Dalva used the Muldoon trucking company to pick up the goods in New York and deliver them to the Levins. The receipts state the goods should be delivered to either the Levins in Boston (Dalva Affidavit, docket # 9, Exhibit L) or Service Solutions in Avon, MA (Dalva Affidavit, docket # 9, Exhibit M & N).

does not allow customers to purchase directly from it and the site states that the company deals primarily with designers. (Hardy Deposition, Exhibit 1, p. 26, of Whiteley Affidavit, docket # 69). The company also posts ads on third party web sites such as Circline.com. While the Levins maintain sales were made from this web site, there is no evidence in the record to suggest a sale.[29] The defendant also advertises in the San Francisco Antique Show Catalog which is nationally distributed. Again, these contacts are far less continuous and systematic than those deemed insufficient to exercise jurisdiction in *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 620 (1st Cir.2001), where the defendant had twelve advertisements and numerous business relationships and contracts. Here, even if Hardy had a business relationship with one particular designer in Massachusetts, that relationship along with few advertisements, is much more limited and intermittent than the defendant's contacts in *Noonan* where telephone calls and faxes over a two year period to secure orders were deemed insufficient to grant jurisdiction. *Noonan v. Winston*, 135 F.3d at 93. Therefore, because defendant Hardy's contacts in Massachusetts are less continuous and systematic than those in other First Circuit cases where general jurisdiction was not found, this court should not exercise general jurisdiction over Hardy.

**Nelson**

 Nelson's contacts in Massachusetts are less sufficient than those discussed in *Swiss American Bank, Noonan, Donatelli*. Since the contacts in *Swiss American Bank, Noonan, Donatelli* are insufficient to establish general jurisdiction, Nelson's contacts are also insufficient to establish continuous and systematic behavior and therefore general jurisdiction. Nelson, a California corporation with its principal place of business in Los Angeles, has never solicited business or made a purchase in Massachusetts. (First Amended Complaint, at ¶ 6), (Nelson Affidavit, docket # 22, ¶ 6). Since the First Circuit has held that it cannot exert jurisdiction over a defendant who does solicit business, this court cannot exercise general jurisdiction over a defendant who has not even made that contact. *See Noonan v. Winston*, 135 F.3d at 94. In addition, Nelson does not advertise in any national magazines or maintain a web site available to Massachusetts residents. (*Id.* ¶ 7), (*Id.* ¶ 9). Since the court in *United States v. Swiss American Bank, Ltd.* could not exercise general jurisdiction over a defendant who placed twelve advertisements in addition to having postings on three web sites and numerous business relationships with the forum, this court cannot exert jurisdiction over Nelson. Nelson's only contact with Massachusetts consisted of three sales made to Roger Harned in 1997 and 2000 on behalf of the Levins. Nelson also sent photographs to Harned in Boston.[30] Again, this minimal amount of contact does not satisfy the First Circuit's requirements in order to be deemed con-

---

**29.** In Plaintiff's Opposition to Defendant Hardy's Motion to Dismiss for Lack of Personal Jurisdiction, docket # 68, p. 5, ¶ 1, the Levins claim that Hardy made sales on Circline.com. The Levins point to Whiteley Affidavit, docket # 69,Exhibit 5 for this contention. However, Exhibit 5 is merely a copy of the Circline.com web page which does not suggest the sale of any item to any customer, let alone a sale

from Hardy to a customer, and let alone a sale by Hardy to a Massachusetts consumer.

**30.** Nelson sent photographs of furniture to Harned at the Ritz–Carlton Hotel in Boston where Harned was staying while visiting some friends in the area before meeting with his clients, the Levins. (Nelson Affidavit, docket # 67, ¶¶ 13–17).

tinuous and systematic. If, in *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 620 (1st Cir.2001), the defendant's participation in an unrelated lawsuit, numerous business relationships, and contracts were considered limited as opposed to continuous, then Nelson's minimal contacts with Massachusetts should be considered limited as well. Therefore, because defendant Nelson's contacts in Massachusetts are less than those in other First Circuit cases where jurisdiction was not found, this court should not exercise general jurisdiction over Nelson.

## IV. Specific Jurisdiction Analysis

In order for this court to exercise specific personal jurisdiction over the defendants, the Levins must meet two criteria. First, they must show that there is a statute or rule granting this court the authority to exercise jurisdiction over the defendants. Second, the Levins must show that the exercise of jurisdiction would comply with due process. *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 35–36 (1st Cir.1999). And, indeed, it is appropriate to proceed with the due process analysis first, and proceed with the long-arm analysis only if the exercise of jurisdiction would be constitutional. *See Daynard, supra*, 290 F.3d 42, 51 (1st Cir.2002)(the court can begin with the constitutional analysis because the Massachusetts long-arm statute extends to the limits of the Constitution); *Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 287 (1st Cir.1999)(court began with constitutional analysis because New Hampshire's long-arm statute reaches to the Constitution's limits); *Massachusetts School of Law v. ABA*, 142 F.3d 26, 35 (1st Cir.1998) (court does not need to analyze

Massachusetts' long-arm statute until plaintiff can show that jurisdiction is constitutional).

On the matter of specific jurisdiction, First Circuit precedent teaches (*United States v. Swiss American Bank, Ltd., supra*, at 620–621):

> Determining whether the plaintiff has alleged sufficient facts for a finding of specific jurisdiction requires a three-part analysis. *Phillips Exeter*, 196 F.3d at 288.
>
> > First, an inquiring court must ask whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum. Second, the court must ask whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws. Third, if the proponent's case clears the first two hurdles, the court then must analyze the overall reasonableness of an exercise of jurisdiction in light of a variety of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction.

### 1. Arises Out Of/Relatedness

In order to determine if a claim "arises out of" or is "related to" the defendants' contact, the court must first determine if there is a nexus between the defendants' contacts and the plaintiffs' causes of action. In doing so, a court must identify each defendants' contacts with Massachusetts "since there can be no requisite nexus between the contacts and the cause of action if no contacts exist." *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 621 (1st Cir.2001).[31]

---

31. In identifying the contacts relevant to the "relatedness" component, contacts deemed not to be continuous and systematic under the

*general* jurisdictional analysis still count *vis a vis* the "relatedness" component because these "contacts may still support the exercise

In *United States v. Swiss American Bank, Ltd., supra,* the United States brought suit against four foreign banks for breach of contract, unjust enrichment, and conversion. The government alleged that the contractual relationship between Swiss American Bank and a Massachusetts resident constituted a contact within the forum state which enabled the court to grant specific personal jurisdiction. *United States v. Swiss American Bank, Ltd.,* 274 F.3d at 621. The *Swiss American Bank* court determined that the contractual relationship itself is not a contact. *Id.* The contract is only an intermediate step towards future consequences which are the real object of the transaction. *Id.*

Additionally, when the defendant is not physically present in the forum jurisdiction, the First Circuit looks to contacts such as mail and telephone calls. *Id.* at 622. In *United States v. Swiss American Bank, Ltd.,* the defendant did not solicit the Massachusetts resident who was using the bank. *Id.* The defendant sent one letter to a Massachusetts court. *Id.* While that single letter was considered a jurisdictional contact, it was not a *related* contact because that letter was not essential to the formation of the contract between the defendant and the Massachusetts resident. *Id.* The letter was not essential to the formation of the contract because it only gave notice to the court that a payment

might, or might not, be made and so the court said it was "only marginally instrumental to the alleged breach."[32] *Id.*

Similarly, in *Massachusetts School of Law v. ABA,* 142 F.3d 26, 35 (1st Cir. 1998), the First Circuit concluded and held that the contacts of seven defendants did not meet the arise out of/relatedness requirement. The court looked at three contacts. *Id.* Three of the defendants participated in a Boston Committee meeting. *Id.* Nothing of importance was decided at this meeting, however, just a postponement of the site visit by one month. *Id.* There were also two letters that were written and sent to Massachusetts. *Id.* The two letters were written by an ABA consultant who was outside of the forum jurisdiction. *Id.* The first letter was to inform the Massachusetts School of Law ("MSL") that the Committee would not grant provisional approval and the second letter was a notice of rejection of MSL's application for a variance and denial of accreditation. *Id.* The court held that a letter from A to B (from an ABA consultant to MSL) reporting on C's actions (the ABA itself) was too attenuated to allow jurisdiction over C (the ABA) in B's (MSL) home state. *Id.* at 35. In addition, the court held that the in-forum effects of the defendants' action could not constitute minimum contacts. *Id.* at 36.[33]

---

of specific jurisdiction *if they are related to the cause of action." United States v. Swiss American Bank,* 274 F.3d at 623 *citing Phillips Exeter v. Howard Phillips,* 196 F.3d at 288. (Emphasis added).

**32.** The relatedness analysis will differ based on the cause of action. If the cause of action is a contract claim, the court will ask if the forum-based activity was essential to the formation of the contract. If the cause of action is a tort claim, the court will focus on causation and ask if the plaintiff has established "cause in fact" and "legal cause." *Massa-*

*chusetts School of Law v. ABA,* 142 F.3d 26, 35 (1st Cir.1998).

**33.** In *Massachusetts School of Law, supra,* the court did note that one of the defendants may have had enough contact with the forum to meet the arises out of/relatedness requirement. *Id.* The defendant wrote a memorandum regarding a conversation he had with MSL. *Id.* The record indicated that the letter was sent to the dean of MSL, presumably at MSL and the dean's Andover, MA phone number was included. *Id.* The inclusion of the phone number indicated that the defendant and dean had spoken while the dean was

## Newel

As noted above, Newel has had some contact with Massachusetts, the forum state. But few, if any, contacts are related to the present causes of action.[34] Newel's contact included sales totaling $666,565, advertisements in five national magazines, a web site, and postings on three other web sites. While these contacts exist, they are wholly unrelated to the Levins' claims and therefore do not support specific jurisdiction over Newel. As stated in *Massachusetts School of Law v. ABA*, 142 F.3d at 35, the contact with the forum must be instrumental to the formation of the contract. The Levins have not shown in the record that the advertisements or the web sites in any way encouraged or provoked this particular 2000 purchase. Nowhere in the record before this court does it indicate that the Levins looked at the web site or decided to make the purchase after viewing advertisements in a magazine. In fact, the record states that the Levins authorized the purchase from Newel only after seeing photographs shown to them by Harned, not Newel. (First Amended Complaint, docket # 2, ¶¶ 49–51).

 Furthermore, the sales made to Massachusetts designers are also unrelated to the Levins' claims. Prior sales are not instrumental to any purchase the Levins made. In fact, there is nothing in the record to suggest that the Levins even knew about these other sales until the commencement of this action. Therefore, these various and sundry contacts do not warrant or support the exercise of specific jurisdiction over Newel, since they are wholly unrelated to the Levins' contract claims.[35]

While the Levins maintain that the sale of Newel's antiques to them constitutes a contact sufficient to grant specific personal jurisdiction, the connection between the sale and the injury is too attenuated as compared to other First Circuit cases. Newel's only contact with Massachusetts was that its merchandise was eventually sent into the forum state. Harned went to New York to browse the gallery. (Baer Affidavit, p. 75, attached to Whiteley Affidavit, docket # 71, exhibit 30). Harned requested photographs and descriptions of various objects. *Id.* Harned, not Newel, then met with the Levins in Boston and showed them the photographs. (First Amended Complaint, docket # 2, ¶¶ 49–51). After viewing the photographs that Harned, not Newel, showed to the Levins, the Levins authorized Harned to purchase the objects on their behalf. *Id.*

---

at his Andover residence. *Id.* The court did not conclude that this contact fulfilled the arises out of/relatedness requirement, but moved to the analysis of purpose availment saying the contact might fulfill the relatedness requirement. *Id.*

34. Count I alleges Intentional Misrepresentation/Fraud; Count II alleges Negligent Misrepresentation; Count XIII alleges Breach of Contract; Count XIV alleges Breach of Covenant of Good Faith; Count XVI alleges Money Had and Received; Count XVII alleges Unjust Enrichment; Count XIX alleges Negligence; Count XX alleges unfair and deceptive trade practices. (Plaintiff's First Amended Complaint, docket # 2, ¶¶ 65–74, 115–122, 128–133, 138–147).

35. As set out in *Massachusetts School of Law v. ABA*, 142 F.3d 26 at 35, for tort claims the court must determine whether the plaintiff has established "but for" cause and "legal cause". Here, the Levins have failed to establish that but for Newel's ads, web site, or previous sales, their injury would not have occurred. In terms of legal cause, the Levins have not established that Newel's ads, web site, or previous sales gave rise to their injury. Therefore, these contacts are also insufficient to establish specific personal jurisdiction over Newel for Count XIX of negligence because they are unrelated to the cause of action.

Neither Newel nor an agent of Newel sent the merchandise into the state of Massachusetts. Instead, Harned made the shipping arrangements to have the merchandise picked up at Newel and shipped to a warehouse in Massachusetts. (Whiteley Affidavit, docket # 71, exhibit 28).

In addition, Newel's contact with the Levins or Massachusetts is much less than contact considered insufficient in *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610 at 622. There, the First Circuit held that a letter sent by the defendant into the forum state was not instrumental to the formation of a contract between the defendant and a resident. *Id.* Therefore, the letter was not related to the government's cause of action. *Id.* Here, Newel did not send any correspondence into the forum state. Even if Newel had sent correspondence into the forum, Newel and the Levins did not have a contract. The only contractual relationship was between Harned and the Levins. Accordingly, inasmuch as Newel did not have any contact

with the Levins in Massachusetts, let alone contacts that were instrumental to the formation of a contract with the Levins, it cannot be fairly said that the contacts which Newel might have had with Massachusetts are related to the causes of action [36] asserted by the Levins against defendant Newel.[37]

### Foster–Gwin

As mentioned above in relation to the general jurisdiction analysis, Foster–Gwin had some contact with Massachusetts. Foster–Gwin sold to other Massachusetts residents and made a purchase from a Massachusetts auctioneer. (Scibelli Affidavit, docket # 63, Exhibit I). In addition, there is some speculation as to whether Foster–Gwin sent a mailing of some sort into Massachusetts.[38] Finally, Foster–Gwin had advertisements in six magazines as well as on two third party web sites. (Scibelli Affidavit, docket # 63, Exhibit B, deposition of S. Collier Gwin, p. 22–24). These contacts Foster–Gwin had with Massachusetts, however, cannot satisfy the arise out of/relatedness requirement neces-

---

**36.** To the extent that plaintiffs bring claims sounding in tort against Newel and the remaining defendants who have moved to dismiss for want of *in personam* jurisdiction, plaintiffs apparently rely, in part, on an "effects" argument to show "relatedness". That is to say, plaintiffs allege that these defendants committed fraudulent or other tortious acts outside the Commonwealth of Massachusetts which caused injury to them in Massachusetts.

For one thing, however, First Circuit law suggests that the so-called "effects" test, set forth in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), applies to the "purposeful availment" (as opposed to the "relatedness") prong of the due process inquiry. *See United States v. Swiss American Bank, Ltd., supra*, at 623. For another, it is not clear in this Circuit that this "effects" test should be routinely applied to torts other than defamation. *Id.* at 624. Finally, this case is clearly distinguishable from *Calder*. As noted in *Swiss American Bank, supra*, at 624, in *Calder*, "... the actual tort or injury, not just

its consequences, occurred within the forum[,]"—a case far different from this case as to Newel and the remaining defendants who have filed a motion to dismiss for want of *in personam* jurisdiction.

**37.** And even if it could be said that Newel had *contacts* with Massachusetts which gave rise to and/or are related to the causes of action asserted by plaintiffs against Newel, this court, below, concludes that those *contacts* do not fulfill the purposeful availment component of the due process analysis.

**38.** That speculation is based on the production of a mailing list with seven Massachusetts' names during the course of jurisdictional discovery. But, as indicated, in note 25, *supra*, it is not even clear that these alleged contacts occurred prior to the filing of the amended complaint in this case, or that these contacts count for the exercise of specific jurisdiction over defendant Foster–Gwin.

sary to comply with due process requirements. The sales and purchase that Foster–Gwin made were not instrumental to the formation of a contract between Foster–Gwin and the Levins. The only contract that existed was between the Levins and Harned. There is no evidence in the record to suggest that the Levins knew about these transactions and that it affected their decision to purchase goods from Foster–Gwin. In addition, the Levins have not shown that the advertisements in magazines or web sites were instrumental to their purchase. Instead, the record shows that the Levins authorized the purchase of the merchandise after defendant Harned showed them pictures and gave them descriptions of the items. Therefore, even if the Levins had seen an advertisement in a magazine, the photographs from Harned, not the advertisements, were instrumental in the formation of the contract. Since none of these contacts were instrumental to the formation of the contract, these contacts cannot allow this court to grant specific personal jurisdiction over the defendant Foster–Gwin.[39]

While the Levins maintain that Foster–Gwin's sale to them constitutes a contact sufficient to grant specific personal jurisdiction, the connection between the sale and the injury is too attenuated as compared to other First Circuit cases. Foster–Gwin's only other contact with the forum state was the delivery of its antiques to the Levins—all of which occurred based upon the arrangements of Harned with the Levins. Foster–Gwin did not solicit the Levins or travel to Massachusetts to meet with the Levins. Instead, defendant Harned went to Boston to meet with the Levins. (First Amended Complaint, docket # 2, ¶¶ 23,32). After the Levins met with Harned and saw the photographs that Harned, not Foster–Gwin, provided them, the Levins authorized Harned to purchase the merchandise. (*Id.*, ¶¶ 30,32).[40]

The merchandise shipped to Massachusetts totals seven pieces. (First Amended Complaint, docket # 2, ¶¶ 27–30, 32). Even if Foster–Gwin, as opposed to Harned, shipped the merchandise to Massachusetts, this alone is insufficient to meet the arises out of/relatedness requirement. In *United States v. Swiss American Bank,* 274 F.3d at 622, the First Circuit said that when the defendant is not physically present, the court must look to contacts such as mail and telephone calls. In that case, the defendant sent a letter to a court in Massachusetts but the court held it to be an insufficient contact to meet the relatedness requirement. *Id.* The letter was not related because it was not essential to the formation of a contract between the resident and SAB. *Id.* The

---

**39.** As set out in *Massachusetts School of Law v. ABA,* 142 F.3d 26 at 35, the court must determine whether the plaintiff has established "but for" cause and "legal cause" for tort claims. Here, the Levins have failed to establish that but for Foster–Gwin's sales to other Massachusetts residents, or advertisements, their injury would not have occurred. Furthermore, the Levins have not established that the advertisements or previous sales gave birth to their injury. Therefore, these contacts are also insufficient to establish specific personal jurisdiction over Foster–Gwin for Count XIX of Negligence because they are unrelated to the cause of action.

**40.** The record is unclear as to who actually shipped the merchandise to Massachusetts.

Plaintiff did not provide the full deposition of S.Collier Gwin. However, based on what is provided in the Scibelli Affidavit, docket # 63, Exhibit B, both Foster–Gwin and Harned acted as shippers. (Scibelli Affidavit, docket # 63, Exhibit B). Foster–Gwin is listed as the shipper on two 2/21/97 invoices, a 10/17/97 invoice, and a 3/4/99 invoice. *Id.* Harned is listed as the shipper on an 8/12/97 invoice. *Id.* The record does not contain all invoices for all purchases made or shipped from Foster–Gwin.

letter was merely notice to a court that payment might or might not be made. *Id.* Therefore, the contact was "only marginally instrumental to the alleged breach." *Id.*

In the present case, even if Foster–Gwin did ship the merchandise, this contact is also only marginally instrumental to the breach. The Levins' contract was with Harned, not Foster–Gwin. Moreover, the contract with Harned had already been established at the time of shipment. Therefore, shipment could not have been instrumental in the formation of the contract. It was only marginally instrumental in terms of any breach because Foster–Gwin was simply following instructions set out by Harned. Foster–Gwin did not intentionally and on its own decide to ship merchandise into Massachusetts.

Similarly, Foster–Gwin's contact is also less than those contacts held to be insufficient in *Massachusetts School of Law v. ABA*, 142 F.3d 26, 35. Defendants in that case went to the forum state to participate in a meeting where they made a decision regarding their relationship with the plaintiff. *Id.* In addition, an agent of the defendant sent two letters to the plaintiff regarding the defendants' relationship with the plaintiff. *Id.* In the present case, no agent of Foster–Gwin ever traveled to Boston to meet the Levins. There was never a phone call between the Levins and Foster–Gwin. Foster–Gwin never sent any information into Massachusetts to the Levins regarding their business relationship because they did not have a business

relationship. Accordingly, inasmuch as Foster–Gwin did not have any contact with the Levins in Massachusetts, let alone contacts that were instrumental to the formation of a contract with the Levins, it cannot be fairly said that the contacts which Foster–Gwin might have had with Massachusetts are related to the causes of action [41] asserted by the Levins against defendant Foster–Gwin.[42]

**Dalva**

As mentioned under the general jurisdiction analysis, Dalva, too, has had some contacts with Massachusetts. In 1999 Dalva made a sale to another Massachusetts resident. (Scibelli Affidavit, docket # 61, Exhibit C). In addition, Dalva has an internet listing and is also listed in a magazine. (*Id.*, Exhibits D & E). While these contacts were not enough to exercise general jurisdiction, this court must analyze whether they could satisfy minimum contacts under specific jurisdiction. *United States v. Swiss American Bank, Ltd.*, 274 F.3d at 623.

These contacts with Massachusetts made by Dalva cannot satisfy the arises out of/relatedness requirement necessary to comply with due process requirements.[43] The prior sale to another Massachusetts resident has no relation to Harned's purchases on behalf of the Levins from Dalva. The same is true regarding the internet listings. Even if they count, see note 10, *supra*, there is no evidence in the record to suggest that those listings were instru-

---

**41.** To the extent that plaintiffs assert claims in tort against defendant Foster–Gwin, see note 36, *supra.*

**42.** And even if it could be said that Foster–Gwin had *contacts* with Massachusetts which gave rise to and/or are related to the causes of action asserted by plaintiffs against Foster–Gwin, this court, below, concludes that those *contacts* do not fulfill the purposeful availment component of the due process analysis.

**43.** Count I alleges intentional Misrepresentation/Fraud; Count II alleges Negligent Misrepresentation; Count V alleges Breach of Contract; Count VI alleges Breach of the Covenant of Good Faith and Fair Dealing; Count XVI alleges Money Had and Received; Count XVII alleges Unjust Enrichment; Count XIX alleges Negligence; Count XX alleges Unfair and Deceptive Trade Practices.

mental to the Levins' decision to have Harned make a purchase from Dalva on their behalf. The record only indicates that the Levins authorized the purchase after Harned, not Dalva, provided them with photographs. Therefore, these contacts with Massachusetts cannot suffice to allow this court to grant specific personal jurisdiction.

Dalva's only other contact with Massachusetts was the sale of its antiques to Harned who was acting as an agent for the Levins in 1997, 1999, and 2000. However, the connection between those sales and the Levins' alleged injury is too attenuated to support the relatedness inquiry. Dalva did not ever have contact with the Levins in Massachusetts or New York. (Dalva II Affidavit, docket # 9, ¶ 12b). For each purchase made, Harned visited the gallery in New York. (*Id.*, ¶ 12c). Harned, not Dalva, met with the Levins and showed them photographs and descriptions of the merchandise. (First Amended Complaint, docket # 2, ¶¶ 20–23). After viewing these, the Levins authorized Harned to purchase the items from Dalva. (First Amended Complaint, docket # 2, ¶ 23).

Harned, not Dalva, made the shipping arrangements. (Dalva II Affidavit, docket # 9, ¶ 12h). The merchandise Harned purchased was shipped to Massachusetts by Muldoon Trucking, a Massachusetts based company. This contact with Massachusetts on behalf of Dalva is too attenuated to establish a nexus between the contact and the arises out of/relatedness of the injury. Dalva did not make any contact with Massachusetts. The only contact that exists, the merchandise entering the state, was a deliberate contact initiated by the Levins through Harned. In the present case, again, Dalva has not made any

intentional, or unintentional, contact with the Levins or with Massachusetts. The Levins hired Harned to leave the state, enter New York, purchase merchandise, and then send the merchandise to Massachusetts. Dalva's only role in this transaction was selling the merchandise to Harned in New York. These limited contacts do not fill the relatedness void.[44]

**Hardy**

As mentioned in the general jurisdiction analysis, Hardy, too, had some contact with Massachusetts. Hardy mailed a catalog to one Massachusetts designer. Hardy also maintains a website and places advertisements on other third party sites. Finally, Hardy has ads in a San Francisco catalog.

These contacts made by Hardy with Massachusetts cannot satisfy the arise out of/relatedness requirement necessary to comply with due process requirements. The Levins have not provided any evidence in the record to show that the catalog mailed to a designer was related to the purchase they authorized Harned to make on their behalf. In addition, the Levins have not provided any evidence in the record to suggest that Hardy's web site or its ads on third-party web sites provoked Harned's purchase from Hardy on their behalf. Therefore, the Levins have not shown these contacts were instrumental to the formation of their contract with Harned.

While the Levins maintain that the sale of Hardy antiques to them constitutes a contact sufficient to grant specific personal jurisdiction, the connection between the sale and the injury is too attenuated as compared with other First Circuit cases so as to meet the arises out of/relatedness

---

**44.** To the extent that plaintiffs assert claims in tort against defendant Dalva, see note 36, *supra.*

requirement. Hardy's only contact with Massachusetts—if it could be called that—was that its merchandise was sent into the forum state by Harned. Harned went to the showroom to look at merchandise. (Whiteley Affidavit, docket # 69, Exhibit 2). Harned, not Hardy, traveled to Massachusetts to meet with the Levins and discuss items to be purchased. (First Amended Complaint, docket # 2, ¶ 42). After viewing the photographs that Harned, not Hardy, brought to the Levins, the Levins authorized Harned to make a purchase on their behalf. (*Id.* at ¶ 45). In this case, there was never any communications whatsoever between the Levins and Hardy.

Hardy's merchandise entering the forum state was not instrumental to the formation of any contract or instrumental to the breach of any contract. Neither Hardy or any agent of Hardy shipped the merchandise into Massachusetts. Instead, Harned made the shipping arrangements to have at least some of the items shipped from California into Massachusetts. (Whiteley Affidavit, docket # 69, Exhibit 2). Moreover, any contract that existed was between the Levins and Harned, not the Levins and Hardy. That contract existed prior to Hardy's merchandise entering the forum state so that contact cannot be considered instrumental to the formation of any contract that may have been breached causing an injury to the Levins. In the present case, there was no agent of Hardy's in the forum state, and Hardy did not

send the merchandise to Massachusetts. Instead, Harned made all shipment arrangements after purchasing the merchandise on behalf of the Levins. Plaintiffs have not shown that any contacts by Hardy satisfy the relatedness prong of the due process analysis.[45]

**Nelson**

As mentioned in the general jurisdiction analysis, Nelson has not had any contacts with Massachusetts other than its sales to the Levins in 1997 and 2000. Nelson does not advertise in any publications circulated in Massachusetts. (Nelson Affidavit, docket # 22, ¶ 7). Nelson does not maintain a web site. (*Id.,* ¶ 9).

While the Levins maintain that the delivery of Nelson's antiques to them constitute contacts sufficient to grant specific personal jurisdiction, the connection between those deliveries and the injury is too attenuated as compared to other First Circuit cases for the reasons more generally set forth above.

■ Nelson did not solicit the Levins or travel to Massachusetts at any time to meet with the Levins. (Nelson Affidavit, docket # 22, ¶ 10). All purchases from Nelson were made through Harned who did not identify his clients or their specific place of residence to be in Massachusetts. (*Id.*).[46] In these circumstances, the mere fact that Nelson's merchandise eventually found its way to the Levins in Massachusetts does not satisfy the relatedness prong of the due process analysis.[47]

**45.** To the extent that plaintiffs assert claims in tort against defendant Hardy, see note 36, *supra.*

**46.** The record is unclear as to how much of the merchandise was sent to Massachusetts and by whom it was sent. While plaintiffs provided a portion of the deposition testimony of John J. Nelson, the portion provided does not contain any information regarding the shipping arrangements. (Scibelli Affidavit, docket # 67, Exhibit E). The record does

contain copies of invoices suggesting a total of eight pieces of merchandise purchased in 1997. (*Id.,* Exhibit B). The record also contains copies of invoices for 2000 suggesting purchases totaling 7 pieces of merchandise. (*Id.,* Exhibit C).

**47.** To the extent that plaintiffs assert claims in tort against defendant Nelson, see note 36, *supra.*

## 2. Purposeful Availment

Even assuming that the meager contacts referred to above did arise out of or were related to the plaintiffs' claims, then the Levins must establish purposeful availment. This second prong of the due process analysis focuses on the defendants' intentionality. *United States v. Swiss American Bank, Ltd.*, 274 F.3d at 623. The plaintiff must show that each defendant voluntarily and purposely directed its activity to the forum state so that the defendant could foresee being hauled into court. *United States v. Swiss American Bank, Ltd.*, 274 F.3d at 624–625.[48] Or, as stated by the district judge to whom this case is assigned *Callahan v. Harvest Board International, Inc.*, 138 F.Supp.2d 147, 160 (D.Mass.2001):

> Assuming, *arguendo*, that Harvest Board's conduct met the "relatedness" test, "the lack of purposeful availment nevertheless would defeat jurisdiction." *Phillips Exeter Acad.*, 196 F.3d at 291. In evaluating this element, the court must determine whether the defendant's contacts with Massachusetts "represent a purposeful availment of the privilege of conducting activities in Massachusetts, *thereby invoking the benefits and protections of its laws and making the defendant's involuntary presence before the Massachusetts court foreseeable.*" *Mass. Sch. of Law*, 142 F.3d at 36 (internal quotations and citations omitted); *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 207 (1st Cir.1994) (the two focal points of purposeful availment are foreseeability and voluntariness). "The function of the purposeful availment re-

quirement is to assure that jurisdiction is not premised solely upon a defendant's random, isolated, or fortuitous contacts with the state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir. 1995) (citations and internal quotations omitted).

(Emphasis added).

Nothing in the record before this court even remotely suggests that any of the moving defendants purposefully availed themselves of the benefits and protections of the laws of the Commonwealth of Massachusetts. It is not enough to fulfill the purposeful availment component, as plaintiffs seemingly suggest, that merchandise of the moving defendants eventually were shipped to the plaintiffs in Massachusetts. To the contrary, as observed by the United States Court of Appeals for this Circuit (*Phillips Exeter Academy v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 292 (1st Cir.1999)):

> Without evidence that the defendant actually reached out to the plaintiff's state of residence to create a relationship-say, by solicitation, *see, e.g., Nowak*, 94 F.3d at 716–1—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day. (Emphasis added).

In this case, there is absolutely no evidence in the record before this court that any of the moving defendants "...actually reached out to [Massachusetts] to create a relationship..." with the plaintiffs. Each of the moving defendants was contacted, not by the Levins, but by Harned, and each of those initial contacts was made in

---

48. "The purposeful availment inquiry, though, focuses on the defendant's intentionality. *See Noonan*, 135 F.3d at 90–91 (discussing *Calder's* intent requirement for purposeful availment). *This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the* forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts. *See Phillips Exeter*, 196 F.3d at 292; *Ticketmaster–N.Y.*, 26 F.3d at 207–208." (Emphasis added).

the moving defendants' places of business—*i.e.*, either in California or New York. None of the moving defendants ever communicated with the plaintiffs—either in Massachusetts, or elsewhere. Viewed in the context of First Circuit precedent which has previously found purposeful availment, and precedent which has not, those meager contacts which plaintiffs have managed to muster fall far short of showing that any of the defendants who has filed a motion to dismiss for want of personal jurisdiction "purposefully availed" itself of the privileges and benefits of the Commonwealth of Massachusetts—that is, the current record as assembled by the plaintiffs and viewed most favorably to the plaintiffs, fails to show that any of the moving defendants "... purposefully and voluntarily direct[ed][its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receiv[ed], to be subject to the court's jurisdiction based on these contacts." *United States v. Swiss American Bank, Ltd.*, 274 F.3d at 624–625.[49]

## V. Conclusion

For the reasons set forth above, this court recommends[50] that the district judge

to whom this case is assigned allow the motions to dismiss filed by defendants Dalva, Hardy, Foster–Gwin, Nelson, and Newel,[51] for want of in personam jurisdiction.

Sept. 11, 2002.

---

**49.** Inasmuch as the plaintiffs have failed to satisfy both the relatedness and purposeful availment prongs of the due process inquiry, there is no occasion to analyze the matter further using the so-called gestalt factors. *See Sawtelle, supra*, 70 F.3d at 1394.

**50.** The parties are hereby advised that under the provisions of Rule 72(b) of the Federal Rules of Civil Procedure and Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file specific and written objections thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or re-

port to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this rule shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia–Copete*, 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir.1980); *United States v. Vega*, 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir.1983); *see also, Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**51.** Docket No. 07 for Dalva, No. 14 for Hardy, No. 23 for Foster–Gwin, No. 20 for Nelson, and No. 36 for Newel.